# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 31, 2023

Lyle W. Cayce
Clerk

No. 18-11368

---

SHANNON DAVES; SHAKENA WALSTON; ERRIYAH BANKS; DESTINEE TOVAR; PATROBA MICHIEKA; JAMES THOMPSON, On Behalf of Themselves and All Others Similarly Situated; FAITH IN TEXAS; TEXAS ORGANIZING PROJECT EDUCATION FUND,

*Plaintiffs—Appellants Cross-Appellees*,

*versus*

DALLAS COUNTY, TEXAS; ERNEST WHITE, 194TH; HECTOR GARZA, 195TH; RAQUEL JONES, 203RD; TAMMY KEMP, 204TH; JENNIFER BENNETT, 265TH; AMBER GIVENS-DAVIS, 282ND; LELA MAYS, 283RD; STEPHANIE MITCHELL, 291ST; BRANDON BIRMINGHAM, 292ND; TRACY HOLMES, 363RD; TINA YOO CLINTON, NUMBER 1; NANCY KENNEDY, NUMBER 2; GRACIE LEWIS, NUMBER 3; DOMINIQUE COLLINS, NUMBER 4; CARTER THOMPSON, NUMBER 5; JEANINE HOWARD, NUMBER 6; CHIKA ANYIAM, NUMBER 7 Judges of Dallas County, Criminal District Courts,

*Defendants—Appellees Cross-Appellants*,

MARIAN BROWN; TERRIE MCVEA; LISA BRONCHETTI; STEVEN AUTRY; ANTHONY RANDALL; JANET LUSK; HAL TURLEY, DALLAS COUNTY MAGISTRATES; DAN PATTERSON, NUMBER 1; JULIA HAYES, NUMBER 2; DOUG SKEMP, NUMBER 3; NANCY MULDER, NUMBER 4; LISA GREEN, NUMBER 5; ANGELA KING, NUMBER 6; ELIZABETH CROWDER, NUMBER 7; CARMEN WHITE, NUMBER 8; PEGGY HOFFMAN, NUMBER 9; ROBERTO CANAS, JR.,

Number 10; Shequitta Kelly, Number 11 Judges of Dallas County, Criminal Courts at Law,

*Defendants—Appellees.*

---

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:18-CV-154

---

Before Richman, *Chief Judge*, and Jones, Smith, Stewart, Dennis, Elrod, Southwick, Haynes, Graves, Higginson, Willett, Ho, Duncan, Engelhardt, and Wilson, *Circuit Judges*.[*]

Edith H. Jones, *Circuit Judge*:

In a second round of en banc review, we conclude that this case, whose aim was to revise by federal decree the Texas state court procedures for felony and misdemeanor pretrial bail, should never have been brought in federal court. We hold that a string of consistent Supreme Court authority commencing with *Younger v. Harris*, 401 U.S. 37, 91 S. Ct. 746 (1971), requires federal courts to abstain from revising state bail bond procedures on behalf of those being criminally prosecuted, when state procedures allow the accused adequate opportunities to raise their federal claims.

Recent years saw a surge of interest in criminal procedure reform. Lawsuits have been filed nationwide seeking to mitigate state and local bail bonding requirements.[1] One such suit resulted in a decision by this court that

---

[*] Judge Ho concurs in the court's ruling on abstention only, and not in the court's ruling on mootness. Judge Oldham is recused and did not participate. Judge Douglas was not a member of the court when this case was submitted to the court en banc and did not participate in this decision.

[1] *See, e.g.*, *H.C. v. Chudzik*, No. 5:22-cv-1588 (E.D. Pa. Apr. 25, 2022), ECF No. 1; *The Bail Project, Inc. v. Comm'r, Ind. Dep't of Ins.*, No. 1:22-cv-862 (S.D. Ind. May 4, 2022),

No. 18-11368

approved broad changes to misdemeanor bail bond procedures in Harris County, Texas. *Compare ODonnell v. Harris Cnty.*, 882 F.3d 528 (5th Cir. 2018), *withdrawn and superseded on panel reh'g*, 892 F.3d 147 (5th Cir. 2018) (*ODonnell I*), *with ODonnell v. Goodhart*, 900 F.3d 220 (5th Cir. 2018) (*ODonnell II*) (trimming terms of original remedial order). This case followed in its wake. But *ODonnell*'s analysis was debatable, though it bound the district court and our initial three-judge appellate panel in regard to Dallas County procedures. *See Daves v. Dallas Cnty.*, 984 F.3d 381 (5th Cir. 2020), *vacated*, 988 F.3d 834 (5th Cir. 2021). The panel decision here affirmed in part preliminary injunctive relief mirroring that in *ODonnell* and remanded for further proceedings. *Id.* at 388, 414.

In due course, our court voted to reconsider this case en banc. *Daves v. Dallas Cnty.*, 988 F.3d 834 (5th Cir. 2021). While the en banc case was pending, the Texas legislature passed a new law (Act of August 31, 2021, 87th Tex. Leg. 2d C.S., S.B. 6) ("S.B. 6") that adopted some of *ODonnell*'s innovations while tightening other bonding requirements. With this complex backdrop, the en banc court resolved several issues raised by *ODonnell*,[2] deferred deciding others,[3] and remanded for the district court to consider two issues: whether the case has been mooted by the new law's taking effect, and

---

ECF No. 1; *Allison v. Allen*, No. 1:19-cv-01126 (M.D.N.C. Nov. 12, 2019), ECF No. 1; *Ross v. Blount*, No. 2:19-cv-11076 (E.D. Mich. Apr. 14, 2019), ECF No. 1.

[2] We held that district and county court at law judges are protected by state sovereign immunity in promulgating bail bond schedules and that plaintiffs lacked standing to sue them on that basis. *ODonnell I*'s contrary conclusions regarding county court at law judges were overruled. *Daves v. Dallas Cnty.*, 22 F.4th 522, 540, 544 (5th Cir. 2022) (en banc).

[3] The en banc decision did not resolve whether the Dallas County Sheriff and Dallas County are proper defendants, and it clarified that because only declaratory relief was issued by the district court against the magistrate judges, they did not appeal, and we issued no decision as to them. *Id.* at 545.

No. 18-11368

whether the federal courts should have abstained pursuant to the body of caselaw rooted in *Younger v. Harris*.[4] The district court then declared moot the plaintiffs' challenge to Dallas County bail procedures, but it concluded the federal court should not have abstained.

This opinion completes our en banc review by addressing the district court's decisions on the remanded questions. Although the parties' dispute has become moot in light of S.B. 6, the antecedent question of federal jurisdiction remains.

## BACKGROUND

A complete factual and procedural background appears in the initial en banc decision in this case. *Daves v. Dallas Cnty.*, 22 F.4th 522, 529–31 (5th Cir. 2022). A few relevant highlights may be recapitulated. The plaintiffs, proceeding as a class, comprised people who had been charged with misdemeanor and felony crimes in Dallas County and who were allegedly unconstitutionally incarcerated pretrial solely because they were financially unable to post required bail. Bail decisions, they claimed, were made via an offense-based schedule promulgated by the district and county court at law judges.[5] The schedule allegedly prevented consideration of the defendants' ability to pay, and it was rigidly enforced by the magistrate judges who initially make these decisions. The County Sheriff correspondingly violated arrestees' constitutional rights by jailing them for failure to make

---

[4] The defendants have preserved the issue of abstention throughout this litigation.

[5] It bears noting that Texas law at the time this suit was filed plainly required bail decisions to rest on a number of factors, including, *inter alia*, the nature of the offense, the "future safety of a victim," the detainee's "ability to make bail," and a proscription against using bail "to make it an instrument of oppression." Tex. Code Crim. P. art. 17.15 (1993).

No. 18-11368

bail. Thus, the plaintiffs were all subject to ongoing state criminal proceedings.

Were the federal court to agree that pretrial incarceration despite inability to pay for bail is unconstitutional, the plaintiffs proposed a variety of fundamental alterations in the pretrial decisional process, including but not limited to obtaining detailed financial assessments from each arrestee, strict time limits for decisionmaking, and the possibility of immediate appeal. As had happened in the *ODonnell* case, the plaintiffs sought the appointment of a federal monitor over the Dallas County criminal justice system. Among other things, the monitor would receive periodic reports and be empowered to respond to any individual defendant or his counsel or family member who believed at any time that the federally installed bail procedures were not being followed. The district court held a hearing, found the local processes unconstitutional on the above-stated basis,[6] and ordered a preliminary injunction essentially in accord with plaintiffs' prescription.

After this court's en banc decision winnowed nonjusticiable claims and remanded, there remained potential liability of the Dallas magistrates (for declaratory relief only pursuant to Section 1983(e)), the Sheriff, and the County. The district court thoroughly considered the two issues we remanded. The district court now declared that the controversy had become moot by the passage and December 2, 2021, effective date of S.B. 6. Substantial changes to statewide bail bond procedures had been wrought, which directly affected the plaintiffs' claims.[7] Overall, the court found, it

---

[6] The court upheld plaintiffs' procedural due process and equal protection claims but denied claims sounding in substantive due process.

[7] Among other things, S.B. 6 requires "individualized consideration of all circumstances" and all statutory factors within 48 hours of arrest. Tex. Code Crim. P. art. 17.028(a). The magistrate must "impose the least restrictive conditions" necessary to "reasonably ensure the defendant's appearance in court" considering the safety of "the

No. 18-11368

could not assess the impact of the statutory changes based on a superseded legal regime and proceedings that had occurred years earlier. S.B. 6 had mooted the controversy.

With respect to *Younger* abstention, the court focused on the doctrine's requirement that a plaintiff must have an "adequate opportunity" in the state proceedings to raise his constitutional challenges. The court relied on a statement in *Gibson v. Berryhill* that "[*Younger*] naturally presupposes the opportunity to raise and have timely decided by a competent state tribunal the federal issues involved." 411 U.S. 564, 577, 93 S. Ct. 1689, 1697 (1973). The district court deduced, "for an alternative mechanism to press federal claims in state court to qualify as adequate, it must be *timely*." (emphasis original). But state habeas proceedings to challenge bail amounts would be "inadequate, i.e., too slow." The court therefore declined to abstain based on *Younger* and its progeny.

Having retained jurisdiction, the en banc court obtained supplemental briefing from the parties before re-evaluating the remanded issues. Plaintiffs continue to contend that Dallas bail bond hearings fall short under the Constitution because there is no requirement of adversary procedures to determine bail, no requirement of factfindings on the record that pretrial detention is necessary to satisfy a compelling state interest, and no presumption against cash bail. The district court's decision on abstention is discretionary, but we review *de novo* whether the prerequisites of abstention

---

community, law enforcement, and the victim of the alleged offense." *Id.* art. 17.028(b). A financial affidavit is required to be provided for each arrestee charged with an offense punishable as a Class B misdemeanor or higher and who is unable to provide the amount of bail required by a schedule or judicial order. *Id.* art. 17.028(f). Any defendant who completes a financial affidavit and cannot pay the amount of bail is entitled to a "prompt review . . . on the bail amount." *Id.* art. 17.028(h). If the magistrate does not lower the bail for that defendant, the magistrate must make written factfindings. *Id.*

No. 18-11368

have been satisfied. *See Tex. Ass'n of Bus. v. Earle*, 388 F.3d 515, 518 (5th Cir. 2004). A ruling on mootness is reviewed *de novo*.

## DISCUSSION

### 1. *Abstention*

Despite the possibility of mootness, this court has discretion to determine whether a federal court should have proceeded to the merits of plaintiffs' bail "reform" lawsuit in the first place. Justice Ginsburg succinctly restated the applicable principles in *Sinochem International v. Malaysia International Shipping*, 549 U.S. 422, 430–31, 127 S. Ct. 1184, 1191 (2007). To paraphrase her writing, a federal court may not rule on the merits of a case without first determining its jurisdiction,[8] but there is no mandatory "sequencing of jurisdictional issues,"[9] and a federal court has leeway "to choose among threshold grounds for denying audience to a case on the merits." *Id.* at 431, 127 S. Ct. at 1191 (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585, 119 S. Ct. 1563, 1570 (1999)). As *Sinochem* further illustrated, "a federal court [need not] decide whether the parties present an Article III case or controversy before abstaining under *Younger v. Harris*." *Id.*

The imperative of reconsidering abstention here is clear. A number of cases in this circuit and others are asking federal courts to judicially order and enforce state court bail reforms. Several federal courts, including the *ODonnell I* court, have rejected abstention without exhaustive consideration.

---

[8] *See Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 93–95, 118 S. Ct. 1003, 1012–13 (1998).

[9] *Sinochem Int'l v. Malaysia Int'l Shipping*, 549 U.S. 422, 431, 127 S. Ct. 1184, 1191 (2007) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584, 119 S. Ct. 1563, 1570 (1999)).

No. 18-11368

But if abstention is mandated by *Younger*'s rationale, much time and money, as well as judicial resources, will be saved on litigation in federal court. The complexity of handling claims for institutional state bail reform in federal court is well demonstrated by the justiciability issues we confronted, and avoided, in the initial en banc proceeding. Friction exists with state criminal courts where, overlooking or misinterpreting abstention, federal courts have forced bail bond changes.[10] Finally, the ultimate impact of abstention does not deprive plaintiffs of a remedy. If required by *Younger*, abstention means they must pursue their claims, or whatever remains of them after S.B. 6, in state courts, with the possibility of final oversight by the U.S. Supreme Court. Our Federalism, the guiding light behind *Younger*, seems to have been forgotten, especially in regard to this species of direct federal intervention into ongoing state criminal proceedings that already provide an opportunity to raise constitutional challenges.

To counteract judicial amnesia, it is necessary to recall the origin of the *Younger* abstention doctrine. By the early 1970s, federal courts were awash (by the standards of that day)[11] in adjudicating a heady mix of newly created constitutional rights. Naming just a few subjects of litigation, courts were reviewing collateral attacks on state criminal convictions, adjudicating the constitutionality of state jail and prison conditions, and addressing due process questions that arose in every public setting from elementary school discipline and welfare termination to employee disputes. Ideas of deference

---

[10] In the *ODonnell* case, for instance, the federal monitor for Harris County has determined "errors" made by judicial officers in setting bail and identified "violations" of the federal consent decree. *See, e.g.*, Fourth Six-Month Monitor Report, *ODonnell v. Harris County*, 4:16-cv-1414 (S.D. Tex. Mar. 3, 2022), ECF No. 732-1 at 15–18.

[11] *See, e.g.*, Henry J. Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U. Chi. L. Rev. 142 (1970); Henry J. Friendly, Federal Jurisdiction: A General View 15–54 (1973).

No. 18-11368

to state governmental systems or state courts seemed to have been overshadowed by the Supreme Court's enthusiasm for effectuating novel notions of social justice and personal rights.

Most pertinent here, federal courts had begun hearing a variety of First Amendment challenges to various state criminal laws. Their direct incursions into state criminal proceedings were spurred by the Supreme Court's decision in *Dombrowski v. Pfister*, 380 U.S. 479, 85 S. Ct. 1116 (1965), where the Court held that an injunction could properly be issued against enforcement of certain state criminal statutes in the face of ongoing prosecutorial actions.

Six years later, however, the Court signaled a major retreat from *Dombrowski* in *Younger v. Harris*, an 8-1 decision with the principal opinion by Justice Black.[12] *Younger* rejected two notions: that adverse impacts on First Amendment rights alone could justify federal intervention, and that the ordinary pains of undertaking a defense against criminal charges could constitute sufficiently irreparable injury for equitable relief. 410 U.S. at 49, 53, 91 S. Ct. at 753, 755. Thus, as succinctly stated in a companion case, *Younger* held that "a federal court should not enjoin a state criminal prosecution begun prior to the institution of the federal suit except in very unusual situations, where necessary to prevent immediate irreparable injury." *Samuels v. Mackell*, 401 U.S. 66, 69, 91 S. Ct. 764, 766 (1971).

Justice Black's opinion traces a "longstanding public policy against federal interference with state court proceedings," based in part on "the basic doctrine of equity jurisprudence that courts of equity should not act,

---

[12] Technically, *Younger* was decided along with five companion cases: *Samuels v. Mackell*, 401 U.S. 66, 91 S. Ct. 764 (1971); *Boyle v. Landry*, 401 U.S. 77, 91 S. Ct. 758 (1971); *Perez v. Ledesma*, 401 U.S. 82, 91 S. Ct. 674 (1971); *Dyson v. Stein*, 401 U.S. 200, 91 S. Ct. 769 (1971); *Byrne v. Karalexis*, 401 U.S. 216, 91 S. Ct. 777 (1971).

No. 18-11368

and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Younger*, 401 U.S. at 43–44, 91 S. Ct. at 750.[13] The Court's opinion relied heavily for this proposition on *Fenner v. Boykin*, 271 U.S. 240, 244, 46 S. Ct. 492, 493 (1926) ("The accused should first set up and rely upon his defense in the state courts, even though this involves a challenge of the validity of some statute, unless it plainly appears that this course would not afford adequate protection."). Citing *Fenner* in an earlier case, Justice Frankfurter emphasized that "[f]ew public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies . . . [relating to] . . . the enforcement of the criminal law." *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 500, 61 S. Ct. 643, 645 (1941) (citations omitted). The legacy of federal court noninterference in equity with state proceedings is over a century old.

But there is also a deeper reason for restraining federal courts acting in equity from getting involved in state criminal prosecutions. Justice Black explained

> the notion of "comity," that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.

---

[13] The Court distinguished cases filed under the doctrine of *Ex parte Young*, 209 U.S. 123, 28 S. Ct. 441 (1908), because, "when absolutely necessary for the protection of constitutional rights," "under extraordinary circumstances, where the danger of irreparable loss is both great and immediate," federal courts may enjoin *potential* state prosecutions. *Younger*, 401 U.S. at 45, 91 S. Ct. at 751 (quoting *Fenner v. Boykin*, 271 U.S. 240, 243–44, 46 S. Ct. 492, 493 (1926)).

No. 18-11368

*Id.* at 44, 91 S. Ct. at 750. This arrangement he deemed "Our Federalism," with roots in the profound debates and compromises that shaped the Constitution. *Id.*

Controversial as *Younger* has seemed to those steeped in the judicial activism of the last half century,[14] the Supreme Court, far from disavowing or materially narrowing the doctrine, repeatedly expanded its reach in the succeeding cases.[15] The doctrine remains controlling today, with particular application to interventions into state criminal procedures. *Younger* requires federal court abstention when three criteria are met: "(1) the federal proceeding would interfere with an 'ongoing state judicial proceeding'; (2) the state has an important interest in regulating the subject matter of the claim; and (3) the plaintiff has 'an adequate opportunity in the state proceedings to raise constitutional challenges.'" *Bice v. La. Pub. Def. Bd.*,

---

[14] "There is no more controversial, or more quickly changing, doctrine in the federal courts today than the doctrine of 'Our Federalism,' which teaches that federal courts must refrain from hearing constitutional challenges to state action under certain circumstances in which federal action is regarded as an improper intrusion on the right of a state to enforce its laws in its own courts." 17B Charles Alan Wright, Arthur R. Miller & Vikram D. Amar, Federal Practice & Procedure § 4251 (3d ed.) (April 2022 Update) (footnotes omitted).

[15] *See, e.g.*, *Samuels*, 401 U.S. 66, 91 S. Ct. 764 (extending *Younger*, in the state criminal prosecution context, to actions seeking declaratory relief); *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S. Ct. 1200 (1975) (extending *Younger* to civil proceedings in which important state interests are involved); *Kugler v. Helfant*, 421 U.S. 117, 95 S. Ct. 1524 (1975) (prohibiting federal court intervention in state criminal proceedings to suppress illegally obtained evidence); *Juidice v. Vail*, 430 U.S. 327, 97 S. Ct. 1211 (1977) (extending *Younger* to state civil contempt procedures); *Trainor v. Hernandez*, 431 U.S. 434, 97 S. Ct. 1911 (1977) (extending *Younger* to state civil enforcement proceedings); *Moore v. Sims*, 442 U.S. 415, 99 S. Ct. 2371 (1979) (extending *Younger* to state child welfare proceedings); *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 102 S. Ct. 2515 (1982) (*Younger* applied to attorney discipline proceeding); *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 107 S. Ct. 1519 (1987) (extending *Younger* to prevent federal court interference with the posting of bond pending appeal).

No. 18-11368

677 F.3d 712, 716 (5th Cir. 2012) (quoting *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432, 102 S. Ct. 2515, 2521 (1982)).[16]

Rather than expound on unrelated nuances of *Younger*, we principally rely on the Supreme Court's decision in *O'Shea v. Littleton*, 414 U.S. 488, 94 S. Ct. 669 (1974), which is closely on point.[17]  In *O'Shea*, the Court held that a group of plaintiffs had no standing to challenge various Cairo, Illinois criminal practices, notably including the imposition of excessive bail, which were alleged to be racially discriminatory and discriminatory against indigents. *Id.* at 498, 94 S. Ct. at 677.  The Court alternatively held that even if some plaintiffs had standing, the principles of *Younger* mandated that no federal equitable relief could be granted in the absence of irreparable injury

---

[16] Further, although none is applicable here, there are three exceptions to *Younger*: "(1) the state court proceeding was brought in bad faith or with the purpose of harassing the federal plaintiff, (2) the state statute is 'flagrantly and patently violative of express constitutional prohibitions in every clause, sentence, and paragraph, and in whatever manner and against whomever an effort might be made to apply it,' or (3) application of the doctrine was waived." *Tex. Ass'n of Bus.*, 388 F.3d at 519 (quoting *Younger*, 401 U.S. at 53–54, 91 S. Ct. at 755).

[17] Judge Southwick's solo opinion purports to be agnostic on whether *Younger* abstention ought to apply to constitutional challenges to bail bond procedures, which he considers somehow severable from a state's overall criminal process.  In light of that threshold ambiguity, it seems unnecessary to discuss his lengthy *arguendo* reasoning as to why *Younger* should not apply in this case.  Suffice it to say, first, that categorically excluding from the ambit of *Younger* abstention (other abstention prerequisites being present) constitutional claims involving bits and pieces of the criminal process, e.g., bail bonding or public defenders appointments, is fundamentally at odds with comity and federalism.  In addition, the remainder of this opinion explains why Judge Southwick's *arguendo* assertions denying application of *Younger* here are in error:  A federal equitable remedy for allegedly unconstitutional bail bond procedures would seriously interfere with ongoing criminal proceedings.  And requiring "timeliness" of bail bond review to forestall abstention is not supported by any *Younger* precedent, is contradicted by *O'Shea* and other precedent, and is contraindicated by a multitude of available, adequate Texas procedures.

No. 18-11368

"both great and immediate." *Id.* at 499, 94 S. Ct. at 678 (quoting *Younger*, 401 U.S. at 46, 91 S. Ct. at 751).[18]

In *O'Shea*, "[t]he Court of Appeals disclaimed any intention of requiring the District Court to sit in constant day-to-day supervision of these judicial officers, but the 'periodic reporting' system it thought might be warranted would constitute a form of monitoring of the operation of state court functions that is antipathetic to established principles of comity." *Id.* at 501, 94 S. Ct. at 679 (footnote omitted). The Supreme Court also pointed out that any person charged with crime, who became dissatisfied with the officials' compliance with a federal injunction, would have recourse to federal court seeking compliance or even contempt. Enforcement of the injunction would mark "a major continuing intrusion . . . into the daily conduct of state criminal proceedings." *Id.* at 502. Such extensive federal oversight would constitute "an ongoing federal audit of state criminal proceedings . . . indirectly accomplish[ing] the kind of interference that *Younger v. Harris* . . . and related cases sought to prevent." *Id.* at 500, 94 S. Ct. at 678.[19]

The Supreme Court coupled its concerns about the interference with ongoing criminal proceedings with its description of various adequate legal remedies available to the plaintiff class members in the course of criminal defense. *Id.* at 502, 94 S. Ct. at 679. These included, *inter alia,* direct or postconviction collateral review; disciplinary proceedings against judges; and

---

[18] Note the procedural similarity between *O'Shea* and this case: standing was at issue as well as *Younger* abstention.

[19] Judge Southwick avers that the proposed injunction in *O'Shea* seems far broader than whatever relief might be ordered in this case. His surmise is contradicted by the actual injunction ordered in *ODonnell I* and copied by the district court here, and by the plaintiffs' continued insistence on monitoring the details of bail bond procedures, i.e., adversary hearings, written factfindings, and the enforcement of a presumption against cash bail.

federal habeas relief. The Court did not engage in extensive factbound review of the "adequacy" or "timeliness" of state procedures in practice.

Only a few years after *O'Shea*, this court found it controlling when faced with a Galveston County, Texas prisoner's complaint on behalf of himself and others against a bevy of local pretrial practices, including allegedly excessive bail determinations made against indigent defendants. *See Tarter v. Hury*, 646 F.2d 1010, 1013 (5th Cir. Unit A June 1981) (discussing *O'Shea*). This court affirmed the dismissal of the plaintiff's complaint. The court held that "[b]ecause *O'Shea* involved a challenge to the imposition of excessive bail, it is conclusive as to Tarter's claim for equitable relief based on that ground." *Id.* (footnote omitted). Just before stating this conclusion, the panel had recapitulated that the Supreme Court refused to consider declaratory or injunctive relief in *O'Shea* that would "require excessive federal interference in the operation of state criminal courts." *Id.*[20]

Together, *O'Shea* and *Tarter* supply compelling precedent for withholding federal adjudication of the bail complaint in both *ODonnell I* and *Daves*. Yet *ODonnell I* held these decisions inapposite for two reasons. First, after listing the three prerequisites for *Younger* abstention,[21] the court

---

[20] In Judge Southwick's view, the en banc decision in *Pugh v. Rainwater*, 572 F.2d 1053 (5th Cir. 1978) (en banc), is our court's "last word" on *Younger* although it does not mention *Younger*. Besides the obvious paradox, which probably arises from the litigation relationship between *Gerstein* and *Pugh*, that view is counterintuitive because two of the judges who sat on the *Pugh* en banc court joined in *Tarter*. It is also irrelevant, because *Pugh*, if it represented a *decision* not to abstain, was superseded by *O'Shea*, which bound the *Tarter* panel.

[21] The plaintiffs in *ODonnell I* conceded that the second prong of *Younger* is met. Indeed, states have a vital interest in regulating their pretrial criminal procedures including assessment of bail bonds. *See Pugh*, 572 F.2d at 1056 (holding that a state has "a compelling interest in assuring the presence at trial of persons charged with crime"); *see also Stack v. Boyle*, 342 U.S. 1, 4, 72 S. Ct. 1, 3 (1951) ("The right to release before trial is conditioned

No. 18-11368

held the third prong—adequate opportunity to raise constitutional questions in the state proceedings—was unsatisfied due to the Supreme Court's decision in *Gerstein v. Pugh*, 420 U.S. 103, 95 S. Ct. 854 (1975). Second, dispatching *Younger*'s first prong, *ODonnell I* held that the abstention principles of comity and federalism were not implicated because "[t]he injunction sought by ODonnell seeks to impose 'nondiscretionary procedural safeguard[s],' . . . [and] will not require federal intrusion into pre-trial decisions on a case-by-case basis." *ODonnell I*, 892 F.3d at 156 (citing *Tarter*, 646 F.2d at 1013–14; *O'Shea*, 414 U.S. at 499–502, 94 S Ct. at 677–79). Both of these reasons are incorrect.

*Gerstein* at first blush appears inconsistent with *Younger* abstention because the Supreme Court there upheld a federal court injunction requiring a judicial hearing in Florida courts on probable cause for pretrial detention. *Gerstein*, 420 U.S. at 125, 95 S. Ct. 868–69. And in footnote nine, the Court's opinion states that abstention was inappropriate.[22] The *ODonnell I* panel relied on this footnote almost exclusively. *ODonnell I* interpreted this footnote to find *Younger* inapt because "the Supreme Court has already concluded, the relief sought by ODonnell—i.e., the improvement of pretrial

___

upon the accused's giving adequate assurance that he will stand trial and submit to sentence if found guilty.").

[22] *Gerstein*'s footnote nine states, "The District Court correctly held that respondents' claim for relief was not barred by the equitable restrictions on federal intervention in state prosecutions, *Younger v. Harris*, 401 U.S. 37, 91 S. Ct. 746 (1971). The injunction was not directed at the state prosecutions as such, but only at the legality of pretrial detention without a judicial hearing, an issue that could not be raised in defense of the criminal prosecution. The order to hold preliminary hearings could not prejudice the conduct of the trial on the merits." *Gerstein*, 420 U.S. at 108 n.9, 95 S. Ct. at 860 n.9 (citing *Conover v. Montemuro*, 477 F.2d 1073, 1082 (3d Cir. 1972); *Perez*, 401 U.S. 82, 91 S. Ct. 674; *Stefanelli v. Minard*, 342 U.S. 117, 72 S. Ct. 118 (1951)).

No. 18-11368

procedures and practice—is *not properly reviewed* by criminal proceedings in state court." *ODonnell I*, 892 F.3d at 156 (emphasis added).

But *Gerstein* is distinguishable on a number of grounds. As the Second Circuit noted, "it is elementary that what the Court said must be viewed in the light of the factual and legal setting the Court encountered." *Wallace v. Kern*, 520 F.2d 400, 406 (2d Cir. 1975). The *Wallace* court explained in detail why, under principles established in *Younger* and its progeny, *Gerstein* did not authorize a New York federal district court to require an evidentiary hearing on bail determinations within a certain period of time. *See id.* at 404–08. *Wallace* accordingly reversed the lower court's injunction. Like *Tarter*, *Wallace* is directly on point.

To explain *Younger*, the *Wallace* court regarded as insupportable "[t]he proposition that the principles underlying *Younger* are applicable only where the federal court is seeking to enjoin a pending state criminal prosecution." *Id.* at 405. Observing that the Supreme Court had extended *Younger* to civil cases in which the state has a "particular interest," *Wallace* reasoned that it would be anomalous to require abstention in such civil cases "but not [in] a bail application proceeding in which the people of the State of New York have a most profound interest." *Id.*[23] The court moved on to discuss *O'Shea*'s rebuke to the lower courts against conducting an "ongoing federal audit of state criminal proceedings." *Id.* at 406 (quoting *O'Shea*, 414 U.S. at 500, 94 S. Ct. at 678). The *Wallace* court commented:

> This is precisely the mischief created by the order below. Having provided for new bail hearing procedures which fix the time of, the nature of and even the burden of proof in the

---

[23] Further, "[t]he assurance that a defendant who has been indicted for a crime be present to stand his state trial and be sentenced if convicted is patently of prime concern to the state." *Id.*

No. 18-11368

evidentiary hearings, the order would permit a pre-trial detainee who claimed that the order was not complied with to proceed to the federal court for interpretations thereof. This would constitute not only an interference in state bail hearing procedures, but also the kind of continuing surveillance found to be objectionable in *O'Shea*.[24]

The *Wallace* court further distinguished *Gerstein* legally and factually. *Gerstein*, the court noted, is literally surrounded by other Supreme Court decisions extending the principles of *Younger* abstention, two of which were decided within a few months of *Gerstein*.[25] Accordingly, the *Wallace* court found *Gerstein* "clearly not decisive" due to the Supreme Court's explanation that in Florida, "the federal plaintiffs there had *no right* to institute state habeas corpus proceedings . . . and that their only other state remedies were a preliminary hearing which could take place only after 30 days or an application at an arraignment, which was often delayed a month or more after arrest." *Id.* (emphasis added). The *Wallace* court stated, "[w]e do not consider this discussion feckless." *Id.* New York law, in contrast, was not bereft of remedies allowing defendants timely to challenge bail determinations. *Id.* at 407. Thus, *Younger* controlled, and the *Wallace* court reversed injunctive relief that would have compelled federal oversight of New York state bail procedures. *Wallace* remains good law in the Second Circuit. *See Kaufman v. Kaye*, 466 F.3d 83, 86 (2d Cir. 2006).

Not only did *ODonnell I* misperceive the context and limited implications of *Gerstein*, but the court also strayed far off the mark in asserting *Younger* abstention is avoidable if the state court review procedures are not "properly" addressing certain constitutional claims. As the Supreme Court

---

[24] *Id.* at 406.

[25] *See Huffman*, 420 U.S. 592, 95 S. Ct. 1200; *Schlesinger v. Councilman*, 420 U.S. 738, 95 S. Ct. 1300 (1975).

No. 18-11368

later explained, "the teaching of *Gerstein* was that the federal plaintiff must have an opportunity to press his claim in the state courts." *Moore v. Sims*, 442 U.S. 415, 432, 99 S. Ct. 2371, 2381 (1979) (citing *Juidice v. Vail*, 430 U.S. 327, 336–37, 97 S. Ct. 1211, 1217–18 (1977)). *Juidice* had applied *Younger* where "it is abundantly clear that appellees had *an opportunity* to present their federal claims in the state proceedings. *No more is required* to invoke *Younger* abstention. . . . [F]ailure to avail themselves of such opportunities does not mean that the state procedures were inadequate." *Juidice*, 430 U.S. at 337, 97 S. Ct. at 1218 (emphases added).

As noted, *Gerstein* addressed detention without a probable cause finding and without any avenue for judicial review.[26] All that *Younger* and its progeny mandate, however, is an opportunity to raise federal claims in the course of state proceedings. Texas law expressly provides mechanisms for challenging excessive bail. A person may move for bond reduction, as one of the named plaintiffs in this case successfully did. *See* Tex. Code Crim. P. art. 17.09(3). Further, "[t]he accused may at any time after being confined request a magistrate to review the written statements of the witnesses for the State as well as all other evidence available at that time in determining the amount of bail." *Id.* art. 17.33. In addition, "[t]he accused in any felony case shall have the right to an examining trial before indictment in the county having jurisdiction of the offense . . . at which time the magistrate at the hearing shall determine the amount or sufficiency of bail, if a bailable case." *Id.* art. 16.01. And there appears to be no procedural bar to filing a motion for reconsideration of any of these rulings.

A petition for habeas corpus is also available. "Where a person has

---

[26] In *Middlesex County*, the Court stated that in *Gerstein*, "the issue of the legality of a pretrial detention *could not be raised* in defense of a criminal prosecution." 457 U.S. at 436 n.14, 102 S. Ct. at 2523 n. 14 (emphasis added).

No. 18-11368

been committed to custody for failing to enter into bond, he is entitled to the writ of habeas corpus, if it be stated in the petition that there was no sufficient cause for requiring bail, or that the bail required is excessive." *Id.* art. 11.24. The remedy is release or reduction in bail. *Id.* This provision is no dead letter.[27] Texas courts have shown themselves capable of reviewing bail determinations. *See, e.g.*, *Ex parte Gomez*, 2022 WL 2720459 (Tex. App. July 14, 2022);[28] *Ex parte McManus*, 618 S.W.3d 404, 406–09 (Tex. App. 2021) (performing a holistic analysis of an excessive bail claim, including the ability to make bail); *Ex parte Robles*, 612 S.W.3d 142, 146–49 (Tex. App. 2020) (same); *Ex parte Castille*, No. 01-20-00639-CR, 2021 WL 126272, at *2–6 (Tex. App. Jan. 14, 2021) (same).

Summing up why the *ODonnell I* court went wrong on the third *Younger* prong—adequacy of state remedies—is the response offered by the Supreme Court in *Middlesex County Ethics Committee*: "Minimal respect for the state processes, of course, precludes any *presumption* that the state courts will not safeguard federal constitutional rights." 457 U.S. at 431, 102 S. Ct. at 2521. That presumption was violated in *ODonnell I*'s rejection of adequate state remedies because Texas detainees have opportunities, beyond those

---

[27] Plaintiffs argue that because *Younger*'s third prong requires that there be an adequate opportunity *in* the state proceedings to raise constitutional challenges, collateral proceedings like habeas cannot, by definition, qualify as adequate. This is refuted by *O'Shea*, which specifically referenced the availability of state postconviction collateral review as constituting an adequate opportunity. 414 U.S. at 502, 94 S. Ct. at 679; *see also Tex. Ass'n of Bus.*, 388 F.3d at 521 (referencing mandamus as an adequate opportunity to raise constitutional challenges).

[28] *Ex parte Gomez* is cited by plaintiffs for the proposition that Texas habeas courts will not review "procedural issues" related to bail. 2022 WL 2720459, at *5–6 (considering the procedural issue of the appointment of counsel at a bail hearing). But in that habeas case, the court adjudicated a defendant's challenge to his bail, which entailed review of the relevant factors, including ability to pay. That constitutes an adequate opportunity. *See O'Shea*, 414 U.S. at 502, 94 S. Ct. at 679.

No. 18-11368

deemed adequate in *O'Shea*, to raise their federal claims.

Moving to the first *Younger* factor—whether equitable relief by a federal court would interfere with ongoing state proceedings—the *ODonnell I* court concluded that the supervisory bail injunction at issue did not implicate concerns about comity and federalism because it "will not require federal intrusion into pre-trial decisions on a case-by-case basis." *ODonnell I*, 892 F.3d at 156 (comparing with *O'Shea*, 414 U.S. at 499–502, 94 S. Ct. at 678–79). But the injunction issued in *ODonnell I*, and mirrored by *Daves*, flatly contradicts the very language in *O'Shea*. The *ODonnell I* "model injunction" expressly mandated the type of "periodic reporting" scheme the Supreme Court precluded. *Compare id.* at 164–66 ("To enforce the 48-hour timeline, the County must make a weekly report to the district court of misdemeanor defendants identified above for whom a timely individual assessment has not been held."), *with O'Shea*, 414 U.S. at 501, 94 S. Ct. at 679 ("'periodic reporting' . . . would constitute a form of monitoring of the operation of state court functions that is antipathetic to established principles of comity").[29] And it opens the federal courts any time an arrestee cries foul. *ODonnell I*, 892 F.3d at 165–66. Even before this court reconsidered *ODonnell I*'s rulings en banc, we found it necessary to disapprove several of that decision's overreaching injunctive provisions. *See ODonnell II*, 900 F.3d at 224–28 (overruling provisions that would have freed defendants for technical noncompliance with federal orders).

In addition to these requirements, considerable mischief remains.[30]

---

[29] The district court in *Daves* implemented the same reporting requirement authorized in *ODonnell I*.

[30] In fact, in their supplemental briefing, plaintiffs' claims for relief including on-the-record hearings and detailed factual opinions concerning bail determinations reify how far federal courts would have to intrude into daily magistrate practices.

No. 18-11368

To paraphrase *Wallace*, "[t]his is precisely the mischief created by the order below . . . . [T]he order would permit a pre-trial detainee who claimed that the order was not complied with to proceed to the federal court for interpretations thereof." 520 F.2d at 406. Such extensive federal oversight constitutes "an ongoing federal audit of state criminal proceedings . . . indirectly accomplish[ing] the kind of interference that *Younger v. Harris* . . . and related cases sought to prevent." *O'Shea*, 414 U.S. at 500, 94 S. Ct. at 678.

For all of these reasons, we hold that pursuant to *Younger*, *O'Shea*, *Tarter*, and *Wallace*, neither *ODonnell I* nor this case should have been adjudicated in federal court. We overrule *ODonnell I*'s holding against abstention.[31] The injunctions issued in Houston and Dallas plainly show federal court involvement to the point of ongoing interference and "audit" of state criminal procedures. Further, in stark contrast to *Gerstein*, Texas courts are neither unable nor unwilling to reconsider bail determinations under the proper circumstances, thus providing state court detainees the chance to raise federal claims without the need to come to federal court. The availability of state court remedies counsels that federal courts may not intervene under equity jurisprudence to decide these disputes.[32]

Plaintiffs and the district court raise objections to the requirement of *Younger* abstention. We address them in turn.

---

[31] In line with Judge Southwick's agnosticism about abstention, he does not seem to disagree with overruling *ODonnell I*.

[32] For those concerned that no final federal remedy is available, please recall that the relevant Supreme Court decisions prohibiting incarceration of indigent defendants for their inability to pay post-conviction fines arose, respectively, from direct appeal (*Williams v. Illinois*, 399 U.S. 235, 90 S. Ct. 2018 (1970)) and state habeas (*Tate v. Short*, 401 U.S. 395, 91 S. Ct. 668 (1971)). Indeed, *Tate*'s ruling issued only a week after *Younger* itself.

No. 18-11368

First, plaintiffs rely on decisions from other courts. The most significant appellate court decision that stands in tension with our conclusion is the Eleventh Circuit opinion in *Walker v. City of Calhoun*, 901 F.3d 1245 (11th Cir. 2018), which brushed away *Younger* because "[a]bstention . . . has become disfavored in recent Supreme Court decisions." *Id.* at 1254. This is very strange. The case cited for that proposition involves state administrative litigation, not interference in criminal proceedings. *See Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72, 134 S. Ct. 584, 588 (2013). The Court in *Sprint* detracted not a whit from *Younger's* ongoing force in respect of criminal adjudication. *See Sprint*, 571 U.S. at 78, 134 S. Ct. at 591 (reaffirming that *Younger* continues to preclude "federal intrusion into ongoing state criminal prosecutions").[33] Additionally, the *Walker* court distinguished *O'Shea* on the basis, contrary to this case, that the injunction sought by the *Walker* plaintiffs did not contemplate ongoing interference with the prosecutorial process. *Walker*, 901 F.3d at 1255. Finally, because the *Walker* court ended up vacating a "modest" remedial injunction ("modest" in comparison with those imposed in *ODonnell I* and *II* and in *Daves*),[34] it may not have viewed *Younger* abstention as a decisive threshold issue.[35]

We disagree with some or all of the reasoning in other appellate court

---

[33] *Pace* the *Walker* court, Wright & Miller's long and detailed section on *Younger* abstention nowhere implies that the doctrine has become "disfavored," and the paper supplements continue to cite cases applying *Younger*. *See generally* §§ 4251–55.

[34] *See Walker*, 901 F.3d at 1255 ("Walker does not ask for the sort of pervasive federal court supervision of State criminal proceedings that was at issue in *O'Shea*."). Notably, the district court injunction contained no ongoing reporting or supervisory components. *See Walker v. City of Calhoun*, No. 4:15-CV-0170, 2017 WL 2794064, at *4–5 (N.D. Ga. June 16, 2017), *vacated*, 901 F.3d 1245 (11th Cir. 2018).

[35] A recent Eleventh Circuit decision also rejected a challenge to bail bond procedures but of course followed *Walker* on *Younger* abstention. *See Schultz v. Alabama*, 42 F.4th 1298, 1312 (11th Cir. 2022).

No. 18-11368

cases where *Younger* abstention was rejected, but in any event, they are factually far afield from this one. *Arevalo v. Hennessy*, for example, is factually distinguishable because the plaintiff challenging a bail determination had fully exhausted his state remedies without success, so there remained no state remedies available in which to raise his individual constitutional claims. *See* 882 F.3d 763, 767 (9th Cir. 2018). Two other cases found *Younger* inapplicable where plaintiffs challenged law enforcement practices that, in parallel with *Gerstein*, essentially prescribed pretrial detention without probable cause. *See Stewart v. Abraham*, 275 F.3d 220, 225–26 (3d Cir. 2001) (no abstention for "rearrest" policy implemented despite magistrates' denials of probable cause); *Fernandez v. Trias Monge*, 586 F.2d 848, 851–53 (1st Cir. 1978) (rejecting abstention in the face of a law requiring juvenile detentions without probable cause). The Sixth Circuit's decision in *Habich v. City of Dearborn* is inapposite because, as the defendant city conceded, the plaintiff there could not assert any of her constitutional claims in the course of a wholly distinct local administrative matter. 331 F.3d 524, 530–32 (6th Cir. 2003). Without any available state law remedy, *Younger* did not apply. *Id.*[36]

Second, the plaintiffs, the district court, and Judge Southwick fix talismanic significance on one line in one Supreme Court case: "[*Younger*] materially presupposes the opportunity to raise and have timely decided by a competent state tribunal the federal issues involved." *Gibson*, 411 U.S. at 577, 93 S. Ct. at 1697. They would infer that *timeliness* of state remedies is required to prevent *Younger* abstention. But *Gibson* did not find an exception

---

[36] Plaintiffs' citation to *DeSario v. Thomas* is misleading because, despite the court's apparently belittling *Wallace* (on which we rely), the court also made clear that *Younger* abstention is required where a plaintiff may avail himself of remedies in an ongoing state criminal proceeding. 139 F.3d 80, 85, 86 n.3 (2d Cir. 1998). *See also* the Second Circuit's subsequent express approval of *Wallace* in *Kaufman*, 466 F.3d at 86.

No. 18-11368

to *Younger because of* untimely state remedies. Instead, the case represents an exception to abstention predicated on the bias of a state administrative tribunal. In context, the quoted sentence reiterated that *Younger* contemplated alternative mechanisms for raising federal claims in ongoing state proceedings before a *competent* state tribunal. *See id.*; *see also Juidice*, 430 U.S. at 337, 97 S. Ct. at 1218 ("Appellees need be accorded only an opportunity to fairly pursue their constitutional claims in the ongoing state proceedings." (citing *Gibson*)).

More to the point, neither the plaintiffs nor the district court nor Judge Southwick cite a single case in which the alleged untimeliness of state remedies rendered *Younger* abstention inapplicable. The reason for this seems plain: *Younger* holds that "the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution" cannot amount to irreparable injury. 401 U.S. at 46, 91 S. Ct. at 751. A few years after *Gibson*, the Supreme Court clarified that state remedies are inadequate only where "state law *clearly bars* the interposition of the constitutional claims." *Moore*, 442 U.S. at 425–26, 99 S. Ct. 2379 (emphasis added); *see also Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 14, 107 S. Ct. 1519, 1528 (1987); *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1292 (10th Cir. 1999). Even more specifically, the Court holds that arguments about delay and timeliness pertain not to the adequacy of a state proceeding, but rather to "conventional claims of bad faith," a well-established exception to *Younger* abstention. *Moore*, 442 U.S. at 432, 99 S. Ct. at 2382. Here, plaintiffs do not allege bad faith. And it bears repeating that Texas state court procedures do not clearly bar the raising of federal claims regarding bail because Texas requires that bail be set individually in each case rather than on a mechanical, unalterable basis. Tex. Code Crim. P. art. 17.15(a).

Plaintiffs' broadside against all the available state remedies ultimately rests on the incorrect assumption that each moment in erroneous pretrial

No. 18-11368

detention is a constitutional violation. But this case does not present the situation that arose in *Gerstein*, where preliminary detention could occur without any judicial finding of probable cause and without legal recourse. An order for cash bail accompanies a judicial determination of probable cause, which means that the defendant has presumably violated the criminal law. At that point, the question becomes how to balance the interests of the defendant in being released pending trial against society's need to enforce the law, protect innocent citizens, and secure attendance at court proceedings. *See, e.g.*, Tex. Code Crim. P. art. 17.15(a). Certainly, any kind of error in assessing excessive bail is lamentable, whether it pertains to the defendant's criminal history, the nature of the instant charge, the protection of potential victims, or his ability to pay cash bail. Even more unfortunate is the plight of a person unconstitutionally convicted who remains incarcerated pending the outcome of appeal or postconviction remedies; yet that is precisely what *Younger* held despite the "untimeliness" of the state criminal process. The gist of *Younger*'s test for availability, however, lies in the fact that errors can be rectified according to state law, not that they must be rectified virtually immediately.

### 2. *Mootness*

The preceding discussion suffices to explain why federal courts must abstain from invoking equity to interfere with ongoing state criminal proceedings where plaintiffs have adequate opportunities to raise constitutional issues. A coequal ground for dismissing this case is mootness. The substantial changes made by the Texas legislature to procedures for assessing bail have been outlined above. S.B. 6 was enacted after the initial panel decision in this case and pending our en banc review. Referencing these changes on remand from the en banc court, the district court analyzed mootness as follows:

No. 18-11368

There is more than one way to ensure that a bail system upholds due process rights. Texas has chosen its way, and Plaintiffs are not entitled to have this Court immediately intervene to tinker with the rules that the Legislature has just recently enacted. Accordingly, the Court holds that Plaintiffs' request for injunctive relief should be dismissed as moot. *Accord* [13C Wright & Miller], Federal Practice and Procedure [§ 3533.6], at Supp. 73 ("A challenge to the validity of a new enactment, however, may be deferred to later litigation when the new enactment is amended while an appeal is pending and the record does not support adjudication as to the new enactment.") (citing *Am. Charities for Reas. Fund. Reg., Inc. v. O'Bannon*, 909 F.3d 329, 332–34 (10th Cir. 2018)).[37]

We substantially agree with the district court's analysis and add in support our previous en banc decision in *Pugh v. Rainwater*, 572 F.2d 1053 (5th Cir. 1978) (en banc). Like this case, *Pugh* addressed new bail legislation in Florida enacted during the pendency of the case on appeal. A panel of the Fifth Circuit held the new bail rules unconstitutional as "wealth-based" "discrimination." *Pugh v. Rainwater*, 557 F.2d 1189, 1198, 1201–02 (5th Cir. 1977), *reversed en banc*, 572 F.2d 1053 (5th Cir. 1978). The en banc court found the new law not facially unconstitutional and dismissed the case for mootness. The court considered plaintiffs' arguments against the operation of state bail procedures to be an as-applied challenge. But the evidence supporting that claim predated the new law. Consequently, "[a]s an attack on the Florida procedures which existed as of the time of trial, the case has lost its character as a present, live controversy and is therefore moot."

---

[37] The Tenth Circuit opinion states: "The law materially changed, fundamentally altering the issues that had been presented in district court. This change in the law renders the appeal moot." *O'Bannon*, 909 F.3d at 332–34.

No. 18-11368

*Pugh*, 572 F.2d at 1058.

We are not bound by *Pugh*, but the resolution of that identical dispute is compelling. To rule on the status of S.B. 6 and its procedures at this point, based on evidence largely generated during proceedings that occurred pre-amendment, would constitute no more than an advisory opinion. Under Article III of the Constitution, federal courts may adjudicate only "actual, ongoing controversies." *Honig v. Doe*, 484 U.S. 305, 317, 108 S. Ct. 592, 601 (1988). That the named plaintiffs have not been subject to bail proceedings since years before the advent of S.B. 6 calls into question their ability to pursue this litigation for ongoing injunctive relief as injured parties, much less class representatives. And although the plaintiffs submitted some kind of video evidence purporting to demonstrate deficient proceedings in the immediate wake of the new law, we agree with the district court's statement that "there is minimal evidence in the record reflecting what actually happens in Dallas County after the effective date of S.B. 6." In sum, the case is moot because "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91, 133 S. Ct. 726 (2013) (internal quotation omitted). Thus, even if federal courts were not compelled by *Younger* and *O'Shea* to abstain, the present controversy must be considered moot.

Plaintiffs challenge mootness in light of two Supreme Court cases. Neither is helpful to plaintiffs. One of these stated that a change in the law during litigation does not moot a claim unless it "completely and irrevocably eradicated the effects of the alleged violation." *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631, 99 S. Ct. 1379, 1383 (1979). *Davis* recited the importance of completely eradicating the "effects of the alleged violation" where the question was mootness owing to the city's voluntary cessation of racially discriminatory practices. As a general rule, voluntary cessation of illegal practices does not render a case moot. *See id.* On the facts before it, the

No. 18-11368

Court held that the case had become moot under the high standard for voluntary cessation. Voluntary cessation is not involved here. More recently, the Supreme Court disclaimed mootness unless the new law affords plaintiffs "the precise relief . . . requested in the prayer for relief in their complaint." *New York State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525, 1526 (2020) (per curiam). That case actually favors the defendants, as it held that the controversy before the Supreme Court became moot due to New York City's amendment of its ordinance "[a]fter we granted certiorari." *Id.* This suggests that this court was exactly right in *Pugh*.[38]

According to the plaintiffs, their complaint is not moot because it is essentially unrelated to the changes made by the Texas legislature. Dallas County's bail practices allegedly remain unconstitutional irrespective of S.B. 6 and irrespective of the existence of bail schedules. Plaintiffs argue that they seek relief "*beyond* what *ODonnell* held to be required," such that the legislature's adoption of measures originally required by *ODonnell* fails to assuage their demands for on-the-record hearings and detailed factfindings that prove in each bail proceeding whether pretrial "detention is necessary to further any state interest." This argument is incoherent. The overhaul accomplished by S.B. 6 specifically requires, within 48 hours of arrest, a bail decision reflecting individual consideration of the relevant Article 17.15(a) statutory factors and "impos[ition of] the least restrictive conditions" that will "reasonably ensure the defendant's appearance in court as required and the safety of the community, law enforcement, and the victim of the alleged

---

[38] Plaintiffs' attempt to shoehorn *Pugh* within these two cases is quite misguided. They assert that the *Pugh* en banc court held that "a new state rule cured the alleged violations and there was no evidence that the challenged conduct persisted." As we explained above, *Pugh* did no such thing in simply holding the new law facially constitutional and declaring any further challenge to be moot.

No. 18-11368

offense." Tex. Code Crim. P. art. 17.028(a), (b).[39]  The crux of this case is now whether the new state law, if applied assiduously by Dallas County magistrates, measures up to plaintiffs' proffered constitutional minima.[40] S.B. 6 is heavily procedural in nature, just like the alleged claims of these plaintiffs.  Thus, both the provisions of S.B. 6 and their implementation are alleged to raise constitutional issues beyond the scope of this case and the circumstances of the plaintiffs who filed it.  The case is moot.[41]

## CONCLUSION

Exercising our discretion to review both justiciability issues following remand, we hold that *Younger v. Harris* and its progeny required the district court to abstain; that the *ODonnell I* decision to the contrary is overruled; and that the case is moot by virtue of intervening state law.

We REMAND with instructions to DISMISS.

---

[39] In setting the amount of bail, the magistrate must consider: (1) the "nature of the offense"; (2) the detainee's "ability to make bail"; (3) the "future safety of a victim of the alleged offense, law enforcement, and the community"; (4) the detainee's "criminal history"; and (5) the detainee's "citizenship status." Tex. Code Crim. P. art. 17.15(a).

[40] If the Dallas County magistrates are not in compliance with state law, this raises issues for state courts to resolve.  Pursuant to *Pennhurst State Sch. & Hosp. v. Halderman*, federal courts may not grant injunctive relief against the defendants on the basis of state law.  465 U.S. 89, 106, 121, 124, 104 S. Ct. 900, 911, 919, 920 (1984).

[41] Plaintiffs urge the court to vacate our previous en banc decision should the case be deemed moot.  In *Daves* (en banc), the court considered only threshold questions of justiciability, rightly recognizing that "there is no mandatory sequencing of jurisdictional issues." *Daves*, 22 F.4th at 532 (quoting *Sinochem*, 549 U.S. at 431, 127 S. Ct. at 1191). Here, we resolve additional threshold questions—those of abstention and mootness—without reaching the merits.  Vacatur of the previous en banc decision is unwarranted.

No. 18-11368

PRISCILLA RICHMAN, *Chief Judge*, concurring in the judgment:

I concur in the judgment holding that this case is moot in light of new legislation passed by the Texas legislature. I would not reach whether *Younger* abstention[1] applies in the present case since the new statutory regime now governs and there is no live case or controversy before this court that requires us to determine whether pre-trial detainees in Texas had an avenue under the former bail regime to present federal claims in challenges to bail determinations and pre-trial detention.[2]

I cannot say, categorically, that *Younger* abstention will always be required when a defendant brings federal claims challenging bail bond procedures. If there is no adequate avenue under state law to challenge bail procedures or pre-trial detentions on federal grounds, then the *Younger* abstention doctrine would, in all likelihood, be inapplicable.[3]

---

[1] *Younger v. Harris*, 401 U.S. 37 (1971).

[2] *See, e.g., Juidice v. Vail*, 430 U.S. 327, 337 (1977) (holding that "it is abundantly clear that appellees had an opportunity to present their federal claims in the state proceedings. No more is required to invoke *Younger* abstention." (footnote omitted)).

[3] *See, e.g., Gerstein v. Pugh*, 420 U.S. 103, 106, 108 n.9 (1975) (holding that *Younger* abstention did not apply because defendants were detained without a timely judicial determination of probable cause and state courts had also "held that habeas corpus could not be used, except perhaps in exceptional circumstances, to test the probable cause for detention under an information").

No. 18-11368

Leslie H. Southwick, *Circuit Judge*, concurring in judgment:

I start with expressing admiration for the clarity and erudition of the opinion for the court. Expected qualities for that author's writings, certainly, but worth noting. I differ with that opinion as to abstention, but I am able to join the majority in dismissing the suit.

My agreement with the majority is with the analysis of mootness. The Texas legislature's adoption of new rules for addressing bail in trial courts has entirely changed the relevant factual and legal underpinnings for the dispute. If a federal district court is the proper venue for a challenge to those procedures, it needs to be based on a new complaint in a new lawsuit.

Of course, the majority opinion also determined that challenges to bail practices under the new enactment may not properly be pursued in federal court. Abstention would block any decision. My view, though, is that we cannot decide in the abstract whether abstention would apply to future claims about bail. Specific claims made and facts shown will matter.

Preliminary to discussing abstention itself, I offer a word or two about whether we should even address the issue. Our holding that claims against Dallas County's former bail practices are moot resolves this appeal. An appeal that no longer contains a live controversy is an especially poor vehicle for issuing a significant additional holding. Several members of the court opine that we should leave the analysis of abstention for another day. In the main, I agree. Nonetheless, with a majority of the court reaching the abstention issue, then expressing a view that differs from my own, I hope there is some benefit in offering a contrasting, even if solitary, analysis.

I.      *Abstention — some background*

"Jurisdiction existing," the Supreme Court explained, "a federal court's 'obligation' to hear and decide a case is 'virtually unflagging.'"

No. 18-11368

*Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). The abstention doctrine identified in *Younger v. Harris*, 401 U.S. 37 (1971), is an "exception to this general rule." *Id.* It provides that in suits requesting injunctive or declaratory interference with certain kinds of state adjudicatory proceedings, federal courts generally must "refus[e] to decide a case in deference to the States." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 368 (1989).

As the majority opinion explains, *Younger* abstention was a fairly quickly imposed limit on the expansiveness of a right to enjoin state prosecutions that had been recognized just six years earlier in *Dombrowski v. Pfister*, 380 U.S. 479 (1965). *See* 17B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, ET AL., FED. PRAC. & PROC. § 4251, at 3 (3d ed. 2007). The *Dombrowski* Court held that overbroad state statutes that criminalized subversive activity had a chilling effect on the exercise of First Amendment rights, and that an injunction should be granted blocking pending and future prosecutions under the statutes. *Dombrowski*, 380 U.S. at 493–97. *Younger* was a "major retreat" from *Dombrowski*. 17B WRIGHT & MILLER, FED. PRAC. & PROC. § 4251, at 7.

The event that was a portent, at least to the discerning, that the Supreme Court would sound retreat was the federal court injunction obtained by John Harris and three other defendants barring Los Angeles County District Attorney Evelle J. Younger from prosecuting them under a statute the district court held was unconstitutional. *Harris v. Younger*, 281 F. Supp. 507, 509–10, 516–17 (C.D. Cal. 1968) (citing *Dombrowski* and holding the statute violated the First Amendment), *rev'd*, *Younger*, 401 U.S. 37. The Supreme Court reversed, holding that principles of equity and comity prohibited federal judicial interference with the ongoing state-court prosecution. *Younger*, 401 U.S. at 43–44, 53–54. On equity, the Court

No. 18-11368

adhered to "the basic doctrine of equity jurisprudence that courts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Id.* at 43–44. On comity, "an even more vital consideration," the Court emphasized that the need for "proper respect for state functions" counseled against interference "with the legitimate activities of the States." *Id.* at 44.

In time, the Court announced that abstention is appropriate if: (1) the requested judicial relief would unduly interfere with the ongoing state proceeding; (2) the state proceeding implicates an important state interest in the subject-matter of the federal claim; and (3) the federal plaintiff has an adequate opportunity to raise the federal claim in state court. *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982).

More recently in its unanimous 2013 *Sprint* opinion, the Court summarized *Younger* abstention after 40 years. *See Sprint*, 571 U.S. 69. "The Court made clear that the circumstances fitting within the *Younger* abstention doctrine are exceptional and include: (1) state criminal prosecutions; (2) civil enforcement proceedings; and (3) civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." 17B Wright & Miller, Fed. Prac. & Proc. § 4254 (Supp. 2022) (explaining *Sprint*, 571 U.S. at 69, 78). The *Younger* abstention doctrine goes "no further" than those three proceedings. *Sprint*, 571 U.S. at 82. As to the three *Middlesex* factors, they are "not dispositive" but are merely "*additional* factors appropriately considered by the federal court before invoking *Younger*." *Id.* at 81 (emphasis in original).

A gateway question for us is whether the *Sprint* Court's category of "state criminal prosecutions" includes preliminary proceedings such as deciding on bail. One reason to say bail determinations are subject to

No. 18-11368

abstention is the Court's reasoning for applying *Younger* to some state civil proceedings.  The Court stated that *Younger* principles apply to state civil proceedings "'akin to a criminal prosecution' in 'important respects.'" *Id.* at 79 (quoting *Huffman v. Pursue*, *Ltd.*, 420 U.S. 592, 604 (1975)).

It could be argued that disruptions of state procedures regarding bail are different only in degree from disruptions to the prosecution, and the state interests are of similar weight.  As the majority here puts it, the "mischief" arising from detailed equitable relief that "fix[es] the time of, the nature of and even the burden of proof in the evidentiary hearings . . . would permit a pre-trial detainee who claimed that the order was not complied with to proceed to the federal court for interpretations thereof." *Majority op.* at 16–17 (quoting *Wallace v. Kern*, 520 F.2d 400, 406 (2d Cir. 1975)).  Supportive of the majority's view is the statement in one of the preeminent federal procedure treatises that a federal court should abstain if relief "would intrude on a *state's administration of justice*, even in the absence of a particular, individual, ongoing state proceeding." 17A James W. Moore, et al., Moore's Fed. Civ. Prac. § 122.72[1][c], at 122-10 (Rev. 2022) (emphasis added).  If that phrasing accurately captures the doctrine, abstention certainly could extend beyond the prosecution itself.

On the other hand, *Dombrowski* and *Younger*, though having much different results, both address whether the unconstitutionality of a criminal statute supporting a state prosecution can be presented in federal court. Constitutional arguments can be presented in a prosecution and have the potential to alter its result. *Dombrowski* held the prosecution could be blocked before it even began if the criminal statute were unconstitutional, while *Younger* said the constitutional arguments needed to be presented in the state criminal proceedings.  Certainly, *Younger* has been stretched beyond that, as the majority opinion discusses, and so will I.  Those extensions, though, are more similar to criminal prosecutions than is the bail determination.  In those

No. 18-11368

extensions, the constitutional claims can be part of the principal proceedings and will thwart those proceedings if accepted. Hence, abstention makes sense at least at the level of not having duplicative forums for the same claims.

Rather differently, the validity of equal protection claims about bail would not affect the validity of or intrude into the criminal prosecution. Even so, depending on the complexity of the relief a court orders as to bail, the courts that handle the prosecutions could be significantly burdened.

I conclude inconclusively. The applicability of *Younger*'s abstention to bail proceedings has no clear answer. One reason I hesitate to agree with the majority that the *Younger* analysis should be applied to bail proceedings is that a clear purpose of *Sprint* was to stop abstention proliferation. "Divorced from their quasi-criminal context," the Court wrote, "the three *Middlesex* conditions would extend *Younger* to virtually all parallel state and federal proceedings, at least where a party could identify a plausibly important state interest." *Sprint*, 571 U.S. at 81. That must not occur, because "abstention from the exercise of federal jurisdiction is the 'exception, not the rule.'" *Id.* at 81–82 (quoting *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 236 (1984)). Certainly, *Sprint* did not announce that *Younger* was dying. Instead, the Court was saying *Younger* had gotten older; its reach had fully matured; it should not be given more tasks.

For me, then, whether abstention could apply here turns on whether bail decisions are in *Sprint*'s category of "criminal prosecutions." In order to engage with the majority and show how my analysis differs, I assume for purposes of this case that abstention is not categorically inapplicable to bail proceedings. I start with the assumption that bail proceedings are "exceptional circumstances." Abstention still must be justified by the "*additional* factors appropriately considered by the federal court before invoking *Younger*." *Sprint*, 571 U.S. at 81 (emphasis in original). The *Sprint*

No. 18-11368

Court stated that these factors are not "dispositive," *id.*, but absent some significant overriding factual or legal considerations in the case, I treat them as guiding the result.

In the following analysis, whether abstention applies here turns on two of the *Middlesex* factors.[1]  First, would injunctive or other relief from the federal court impermissibly interfere with ongoing state-court proceedings?  *Middlesex*, 457 U.S. at 431–32, 437.  Further, "is there an adequate opportunity in the state proceedings to raise constitutional challenges"?  *Id.* at 432.  My separate analysis of each factor follows.

## II.    *Impermissible interference with ongoing state proceedings*

"Our Federalism" is the rubric Justice Hugo Black used for *Younger* abstention.  *Younger*, 401 U.S. at 44.  We must avoid both "blind deference" to states and "centralization of control over every important issue."  *Id.* Even though the *Younger* doctrine has expanded since its 1971 origin, federalism remains key.

As I begin, I request forbearance.  My effort to explain some of the caselaw requires me to detail what those cases actually involved and, thus, how to interpret their wording.  Though I seek to give context without overburdening, the direction I am willing to err will become obvious.

One case that began in the Fifth Circuit, with multiple opinions including one from the Supreme Court and one from our *en banc* court, is a good source for early and still applicable analysis of prohibited interference with state courts.  *See, e.g., Gerstein v. Pugh*, 420 U.S. 103 (1975); *Pugh v.*

---

[1] I will not discuss whether the proceedings involve important state interests, as the state's interests in its own bail proceedings are certainly substantial.

No. 18-11368

*Rainwater*, 572 F.2d 1053 (5th Cir. 1978) (*en banc*).[2]  The case led to one of the earliest Supreme Court opinions rejecting *Younger* abstention.  The case began as a class-action challenge in the former, six-state Fifth Circuit that had Florida within its boundaries.  The named plaintiffs were arrested and detained in Dade County, Florida, based solely on a prosecutor's information[3] charging them with offenses.  The lead plaintiff was Robert Pugh, jailed at the time of the complaint on an information charging him with robbery and other offenses. *Gerstein v. Pugh*, 420 U.S. at 105 n.1.

One defendant was Richard Gerstein, the State Attorney (*i.e.*, chief prosecutor) for the judicial circuit containing Miami and Dade County. *Id.* at 107.  Gerstein had statutory authority to file an information against those alleged to have committed a crime under state law, leading to a suspect's detention based on Gerstein's own, unreviewed determination about probable cause. *Id.* at 105–06.  Plaintiffs asserted that Gerstein's policy was "to refuse to provide a defendant in custody by virtue of a directly filed information an opportunity for a binding preliminary hearing to determine probable cause for his incarceration."  Complaint at 28, *Pugh v. Rainwater*,

---

[2] I offer an explanation about shortform case names used in my opinion.  In following what I consider to be the proper convention, the usual one-party names for some opinions are spurned.  I believe proper practice is *not* to use the name of the governmental official.  For example, multiple opinions arose from litigation brought by plaintiff Robert Pugh after he was detained in Dade County jail. *Gerstein v. Pugh*, 420 U.S. at 105–06.  Defendant Richard E. Gerstein was the State Attorney for Dade County, Florida, *id.* at 107, while James Rainwater was one of three defendant Small Claims Court judges. *See* Complaint at 2–4, *Pugh v. Rainwater*, No. 71-CV-448 (S.D. Fla. Mar. 22, 1971), in Appendix filed with Petitioner's Brief after grant of Writ of Certiorari, *Gerstein v. Pugh*, 420 U.S. 103 (No. 73-477).  Thus, *Pugh* is my shortform.  In order to combine the exigencies of reader clarity with the eccentricities of writer preference, I will refer to both parties when rejecting a standard shortform for a case.  Yet, I do not wish to be ridiculous.  The governmental party was Younger, the private party Harris, but I refer to that case as *Younger*.

[3] "Information.  A formal criminal charge made by a prosecutor without a grand-jury indictment." Black's Law Dictionary 795 (8th ed. 2004).

No. 18-11368

*supra* n.2. The relief sought against Gerstein included a declaratory judgment that a prompt probable-cause hearing was constitutionally necessary, and an injunction requiring such hearings. *Id.* at 11–13.[4] Prosecutor Gerstein's part of the case would be considered by the Supreme Court.

Relief was also sought against eight state-court judges. *Id.* at 4. Three were Small Claims Court judges, James Rainwater being the first named. *Id.* The other five were Justices of the Peace. *Id.* Plaintiffs asserted that the eight judges unconstitutionally set monetary bail for all arrestees, regardless of the arrestee's ability to pay. *Id.* at 10. The plaintiffs alleged that the practice "discriminates against poor persons solely because of their poverty without any rational basis," in violation of the Equal Protection Clause of the Fourteenth Amendment. *Id.* On that claim, the plaintiffs requested a declaratory judgment that secured money bail for indigent arrestees was discrimination under the Fourteenth Amendment, and an injunction prohibiting the use of monetary bail in this manner. *Id.* at 13. The Supreme Court did not consider the Rainwater bail issues.

The district court ruled for the plaintiffs on the probable-cause issue but for the defendants on the bail issue. *Pugh v. Rainwater*, 332 F. Supp. 1107, 1115 (S.D. Fla. 1971). That decision led to separate appeals to this court. In the probable-cause appeal, we upheld the district court's injunction and declined to abstain. *Pugh v. Rainwater*, 483 F.2d 778 (5th Cir. 1973). State Attorney Gerstein then petitioned the Supreme Court for a writ of certiorari; we held the issue of bail in abeyance. With some modifications to the Fifth

---

[4] The complaint also alleged that the defendant judges had authority to provide preliminary hearings but would not do so for "persons incarcerated in the Dade County Jail by virtue of a direct information filed by defendant Gerstein." *Id.* at 4, 7–8.

No. 18-11368

Circuit decision, the Supreme Court affirmed and remanded for further proceedings. *Gerstein v. Pugh*, 420 U.S. at 126.

The *Gerstein v. Pugh* Court's discussion of *Younger* was relegated to a footnote; there, the Court rejected abstention:

> The District Court correctly held that respondents' claim for relief was not barred by the equitable restrictions on federal intervention in state prosecutions, *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). The injunction was not directed at the state prosecutions as such, but only at the legality of pretrial detention without a judicial hearing, an issue that could not be raised in defense of the criminal prosecution. The order to hold preliminary hearings could not prejudice the conduct of the trial on the merits.

*Id.* at 108 n.9. This language certainly supports that *Younger* is inapplicable to bail. Even so, a legal doctrine can evolve from its original terms.

Because the Supreme Court stated the district court "correctly held" that the claims were not barred by *Younger*, I examine the district court's holding. The district court quoted *Younger* as permitting an injunction when there is "'great and immediate' 'irreparable injury' other than the 'cost, anxiety, and inconvenience of having to defend against a single criminal prosecution,' and the injury must be one that cannot be eliminated by the defense therein." *Pugh v. Rainwater*, 332 F. Supp. at 1111 (quoting *Younger*, 401 U.S. at 46). This is the district court's description of Pugh's injury:

> Plaintiffs at bar are challenging the validity of their imprisonment pending trial with no judicial determination of probable cause. These facts present an injury which is both great and immediate and which goes beyond cost, anxiety, and inconvenience. Furthermore, the state has consistently denied the right asserted, so that the injury is irreparable in that it cannot be eliminated either by the defense to the prosecution or by another state proceeding.

No. 18-11368

*Id.*

The district court's correct understanding of *Younger* was that injury arising from being detained without a probable cause hearing cannot be dismissed as simply the "cost, anxiety, and inconvenience" of a criminal prosecution. *Id.* Generally, a prosecution does not violate someone's constitutional rights even when the result is an acquittal. Cost, anxiety, and inconvenience are inherent in being prosecuted for a crime. *Gerstein v. Pugh*, though, supports that detention without any judicial determination that there is probable cause causes an injury that is not inherent, and indeed is abhorrent, to our criminal justice system. The Court elaborated in 1979 by stating that "the injunction [in *Gerstein v. Pugh*] was not addressed to a state proceeding and therefore would not interfere with the criminal prosecutions themselves." *Moore v. Sims*, 442 U.S. 415, 431 (1979). More on *Sims* later.

After the Supreme Court's *Pugh* opinion but before this court made its final decision as to the bail portion of the suit, the Florida Supreme Court promulgated a new rule concerning bail. *See Pugh v. Rainwater*, 557 F.2d 1189, 1194, 1200–01 (5th Cir. 1977). After a panel decision, we rehear the bail issue *en banc*. *See Pugh v. Rainwater*, 572 F.2d 1053 (5th Cir. 1978) (*en banc*). The *en banc* court held that the plaintiffs' original bail challenge was mooted by the new Florida rule. *Id.* at 1058. We then held that the new Florida rule was not facially unconstitutional. *Id.* at 1059. We explained that the automatic detention of indigent arrestees "without meaningful consideration of other possible alternatives" would violate the Fourteenth Amendment, but that the new Florida rule did not facially preclude meaningful consideration. *Id.* at 1057–59. The *en banc* opinion remains valid that indigents' constitutional rights can be violated by bail decisions.

We did not discuss *Younger* in the panel or *en banc Pugh v. Rainwater* opinions as to bail following the Supreme Court's *Gerstein v. Pugh* opinion

No. 18-11368

concerning probable-cause determinations. Reasons for the failures can be proposed now, but I conclude that silence should be accepted as our court's last word in the *Pugh* collection of opinions on *Younger*.

I have discussed the series of *Pugh* decisions first because of the litigation's origins in this circuit and the importance of the decisions to our subsequent jurisprudence. The lodestar precedent for the majority here, though, is a decision three years after *Younger*, namely, *O'Shea v. Littleton*, 414 U.S. 488 (1974).[5] Plaintiffs were 17 black and two white residents of Cairo, Illinois, and its surrounding county; they were not detainees. *Id.* at 491. They brought a class action to challenge alleged racial discrimination in the setting of bail, imposing of fines, and sentencing in a municipal court system. *Id.* at 490–91. The Seventh Circuit gave substantial detail about their claims and categorized them by groups of defendants such as the local prosecutor Berbling, magistrate judge O'Shea, trial judge Spomer, and the prosecutor's investigator Shepherd. *Littleton v. Berbling*, 468 F.2d 389, 392–93 (7th Cir. 1972). Claims against the prosecutor included discriminating against black arrestees in multiple ways, while those against the investigator were conspiring with the prosecutor to discriminate. *Id.*

Importantly for us, the claims against the judges were broad, including their use of a bond schedule that did not consider the individual defendant:

> Spomer and O'Shea, as judges, engage in a pattern and practice of discriminatory conduct based on race as follows: They set bond in criminal cases by following an unofficial bond schedule without regard to the facts of a case or circumstances of an individual defendant. They sentence black persons to longer criminal terms and impose harsher conditions than they do for

---

[5] Yet again, I will apply my convention to this opinion and use plaintiff Littleton's name as the shortform, not the governmental defendant Judge O'Shea's.

No. 18-11368

> white persons who are charged with the same or equivalent
> conduct. They require plaintiffs and members of their class,
> when charged with violations of city ordinances which carry
> fines and possible jail penalties, if the fine cannot be paid, to
> pay for a trial by jury.

*Id.* at 393.

The Seventh Circuit reversed the district court's dismissal of the suit and gave guidance on potential remedies:

> Obviously, since this case is before us on a motion to dismiss,
> it would be improper for us to attempt to spell out in detail any
> relief the district court might grant if the plaintiffs can prove
> what they allege. Nevertheless, as this appears to be a case of
> first impression as to the type of relief approved, we feel
> obligated to give the district court some guidelines as to what
> type of remedy might be imposed. *We do not mean to require the*
> *district court to sit in constant, day-to-day supervision of either state*
> *court judges or the State's attorney.* An initial decree might set
> out the general tone of rights to be protected and *require only*
> *periodic reports of various types of aggregate data on actions on bail*
> *and sentencing and dispositions of complaints.*

*Id.* at 414–15 (footnotes omitted; emphasis added). The italicized statement about periodic reports was quoted disapprovingly by the Supreme Court when it reversed. *See Littleton*, 414 U.S. at 493 n.1.

The Seventh Circuit's allowing a federal court to get periodic reports and then to inject itself even further into the operation of local criminal courts was central to the Supreme Court's reversal. The plaintiffs had requested "an injunction aimed at controlling or preventing the occurrence of specific events that might take place in the course of future state criminal trials." *Id.* at 500. "An injunction of the type contemplated by respondents and the Court of Appeals would disrupt the normal course of proceedings in the state courts via resort to the federal suit for determination of the claim *ab initio*."

No. 18-11368

*Id.* at 501.  Such an injunction "would require for its enforcement the continuous supervision by the federal court over the conduct of the petitioners in the course of future criminal trial proceedings involving any of the members of the respondents' broadly defined class." *Id.*

My difference with the majority on what to make of the combination in *Littleton* of extravagantly broad intrusion into state court functions, and the fact that one of the intrusions concerned bail, is mirrored in different views expressed by other circuit courts.  The First Circuit distinguished *Littleton* as involving "continuing federal judicial supervision of local criminal procedures" and found no *Younger* barrier in its case because the plaintiff's "challenge to pretrial detention procedures could not be raised as a defense at trial." *Fernandez v. Trias Monge*, 584 F.2d 848, 851 n.2, 853 (1st Cir. 1978).  The Ninth Circuit distinguished the broad relief sought in *Littleton* from an exclusive challenge to bail procedures.  *See Arevalo v. Hennessy*, 882 F.3d 763, 766 n.2 (9th Cir. 2018).  It concluded that abstention would be inappropriate when the claims solely concern bail.  *Id.* at 766.  The Eleventh Circuit reached a similar conclusion in a decision I will discuss in more detail later.  *See Walker v. City of Calhoun*, 901 F.3d 1245, 1254–55 (11th Cir. 2018).  For now, I state only that I largely agree with *Walker*.

The Fifth Circuit stated a different view of *Littleton* from that of the just-cited opinions.  *See Tarter v. Hury,* 646 F.2d 1010 (5th Cir. Unit A June 1981).  After describing abstention in *O'Shea v. Littleton*, we held: "Because *O'Shea* involved a challenge to the imposition of excessive bail, it is conclusive as to Tarter's claim for equitable relief based on that ground." *Id.* at 1013.  With trepidation, I am bold to say I disagree with that opinion's author, one of the ablest of judges ever on this court, John Minor Wisdom.  Of course, I have already been worrisomely bold by disagreeing with able current colleagues.  *Tarter* seems to mean that abstention categorically

No. 18-11368

applies to claims about bail in state court.  Even if it does, Judge Wisdom detailed a narrower understanding of *Littleton*:

> The plaintiffs sought declaratory and injunctive relief.  The Supreme Court held that dismissal of those claims was appropriate because the granting of such equitable relief would require excessive federal interference in the operation of state criminal courts.  The enforcement of any remedial order granting the relief requested would require federal courts to interrupt state proceedings to adjudicate allegations of asserted non-compliance with the order.

*Id.* at 1013.  That quotation supports that the claims were dismissed not simply because they dealt with bail but because of how they dealt with bail.

Though I have acknowledged what is contrary to my views about *Tarter*, I close with what I find quite accurate.  After resolving the claim about bail, the court stated that a different request for relief — "an injunction requiring clerks to file all *pro se* motions [—] would not require the same sort of interruption of state criminal processes that an injunction against excessive bail would entail."  *Id.*  Here, Judge Wisdom made a fact-based analysis and found certain relief would not be improperly intrusive.  In my view, that also should have been the form of analysis applied to bail.

Another opinion that the majority here embraces is one in which the Second Circuit abstained.  *See Wallace v. Kern*, 520 F.2d 400 (2d Cir. 1975).  That court held that abstention was rejected in *Gerstein v. Pugh* because the plaintiffs had no opportunity to raise their federal claims in the state-court system, whether directly or collaterally.  *Id.* at 407.  Collateral opportunities to present federal claims such as in state *habeas*, the court stated, provide adequate opportunities for abstention purposes.  *Id.* at 406–07.

Because of the importance the majority here gives to the *Wallace* opinion, I will analyze it in detail.  The claims in that suit by indigent pretrial

detainees in a Brooklyn jail were extensive: legal aid attorneys had staggering caseloads they could not possibly handle; plaintiffs' speedy trial rights were denied by lengthy delays; "bail [was] denied where no imposition of money conditions [was] reasonably necessary"; lengthy pretrial detention caused loss of employment and other harms; and several other claims concerning the effects of delay. *Wallace v. McDonald*, 369 F. Supp. 180, 184 (E.D.N.Y. 1973).[6] District Judge Orrin Judd, in a series of decisions, generally accepted each of the plaintiffs' claims. In a slightly later series of decisions, the Second Circuit reversed them all, one by one.[7]

The Second Circuit summarized this history in its third opinion:

In *Wallace I*, Judge Judd had granted an application for a preliminary injunction against the Legal Aid Society's acceptance of any additional felony cases in the Kings County Supreme Court if the average caseload of its attorneys

---

[6] The lead defendant was Miles F. McDonald; he was dismissed from the case because he had retired as a trial judge before suit was even filed. *Wallace v. McDonald*, No. 72-C-898 (E.D.N.Y. Feb. 27, 1973), at *16, *18-19 (the published opinion cited in the text redacted these details). The full 1973 opinion and a 1975 unpublished opinion I cite later are no longer in the district court records. They were provided by Sarah Wharton of the Harvard Law School Library after being located in Historical & Special Collections; Orrin Grimmell Judd papers; Opinions & Speeches, Sept. 1972–July 1973, and Aug. 1974–Aug. 1975. A Fifth Circuit librarian, Judy McClendon, was the intermediary. My thanks to both. Justice Michael Kern was the lead defendant in subsequent opinions.

[7] Judge Judd's boldness more generally is shown by his order of July 25, 1973, two months after his first *Wallace* injunction, enjoining the Secretary of Defense from conducting combat operations in Cambodia, Vietnam, and Laos. *See Holtzman v. Schlesinger*, 361 F. Supp 553, 565–66 (E.D.N.Y. 1973). On July 27, the Second Circuit stayed the injunction; on August 1, the Second Circuit Justice, Thurgood Marshall, refused to vacate the stay; heedless, on August 3, Justice William Douglas vacated the stay; and on August 4, the full Court stayed the injunction. *See Holtzman v. Schlesinger*, 414 U.S. 1304, 1304–05, 1316, 1321 (1973). On August 8, the Second Circuit reversed and ordered dismissal. *Holtzman v. Schlesinger*, 484 F.2d 1307, 1314–15 (2d Cir. 1973). A lot happened fast, but the Supreme Court's message to all judges (and to Justice Douglas, too) was — stay in your lane. How that obligation applies to bail is the central issue before us.

No. 18-11368

> exceeded 40.  The district court also had ordered the Clerk of
> the Criminal Term of the Kings County Supreme Court to
> place on the calendar all *pro se* motions filed by inmates of the
> Brooklyn House of Detention.

*Wallace v. Kern*, 520 F.2d at 401 (summarizing *Wallace v. Kern*, 392 F. Supp.
834 (E.D.N.Y. 1973), *rev'd*, 481 F.2d 621 (2d Cir. 1973)) (*Wallace I*).  The
circuit court was so insistent about vacating the injunction that its opinion
was delivered from the bench after argument.  *See Wallace I*, 481 F.2d at 622.
The court did not cite *Younger*, indeed, it cited only one precedent, but it did
say that "under the principle known as comity a federal district court has no
power to intervene in the internal procedures of the state courts."  *Id.*

The circuit court in 1975 described the second rejected order this way:

> In *Wallace II*, Judge Judd had granted an application for a
> preliminary injunction ordering that each detainee held for trial
> for more than six months be allowed to demand a trial and be
> released on his own recognizance if not brought to trial within
> 45 days of his demand.  This court reversed on the ground that
> questions concerning the right to a speedy trial are properly to
> be determined on a case-by-case basis rather than by a broad
> and sweeping order.

*Wallace*, 520 F.2d at 401 (summarizing *Wallace v. Kern*, 371 F. Supp. 1384
(E.D.N.Y. 1974), *rev'd*, 499 F.2d 1345 (2d Cir. 1974)) (*Wallace II*).  "Relief
from unconstitutional delays in criminal trials is not available in wholesale
lots," the court stated.  *Wallace II*, 499 F.2d at 1351.  *Younger* was not cited.

Finally, *Wallace III* dealt with bail.  The relief ordered was extensive,
including time limits for bail determinations, granting a right to an
evidentiary hearing, and requiring consideration of other forms of release:

> Judge Judd ordered that an evidentiary hearing be had on
> demand at any time after 72 hours from the original
> arraignment and whenever new evidence or changes in facts

> may justify.  At the hearing, the People would be required to present evidence of the need for monetary bail and the reasons why alternate forms of release would not assure the defendant's return for trial, and the defendant would be permitted to present evidence showing why monetary bail would be unnecessary.  The defendant was also held to be entitled to a written statement of the judge's reasons for denying or fixing bail.

*Wallace v. Kern*, 520 F.2d at 403 (*Wallace III*) (summarizing and reversing *Wallace v. Kern*, No. 72-C-898 (E.D.N.Y. Feb. 14, 1975)).

The *Wallace III* opinion accurately equated the Wallace injunction to the remedy in *Littleton* of having periodic reporting to the federal court on state court proceedings.  The *Wallace* district court had "provided for new bail hearing procedures which fix the time of, the nature of and even the burden of proof in the evidentiary hearings." *Id.* at 406.  That "order would permit a pre-trial detainee who claimed that the order was not complied with to proceed to the federal court for interpretations thereof." *Id.*  The similarities to *Littleton* are highlighted by the fact the *Wallace* district court cited the not-yet-reversed Seventh Circuit *Littleton* opinion four times to justify refusing to dismiss the suit, then the Second Circuit's *Wallace III* opinion cited the Supreme Court's *Littleton* opinion eight times when it reversed the district court. *See Wallace v. McDonald*, 369 F. Supp. at 186–87 (citing *Littleton v. Berbling*, 468 F.2d 389); *Wallace III*, 520 F.2d at 404–08 (citing *O'Shea v. Littleton*, 414 U.S. 488).

The *Wallace III* court interpreted *Littleton* to invalidate the restrictions on state court bail procedures imposed by the district court because they were an "ongoing federal audit of state criminal proceedings." *Id.* at 405–06 (quoting *Littleton*, 414 U.S. at 500).  Indeed, the district court's "order created an intrusion upon existing state criminal process which is fissiparous and gratuitous and it further ignored the prior rulings of this court

on appeals in this case." *Id.* at 408. My vocabulary is not as extensive as that court's, but the obvious point is that the district court order was overly intrusive. The district court had rejected abstention, though, because "[i]mproper pre-trial confinement would not be an issue on a defendant's trial on the criminal charge." *Wallace*, No. 72-C-898 (Feb. 14, 1975), at *62.

The *Wallace III* opinion distinguished *Gerstein v. Pugh*, which had rejected abstention in the (in)famous footnote 9. *Wallace III*, 520 F.2d at 406–07. To remind, that footnote relied on the absence of a direct challenge to any specific prosecution and the fact the claims were only about "the legality of pretrial detention without a judicial hearing, an issue that could not be raised in defense of the criminal prosecution." *Gerstein v. Pugh*, 420 U.S. at 108 n.9. The *Wallace III* court determined that in the context of the Florida procedures at issue, the Supreme Court was implicitly relying on its statement earlier in its opinion that no adequate procedures were available under state law to contest the absence of a judicial determination of probable cause. *Wallace III*, 520 F.2d at 406.

I doubt, though, that the Supreme Court in 1975 was incorporating by reference some implied factual limitation to its statement. Footnote 9 makes no hint of such reliance — to my eyes at least. It is a categorical statement, not qualified by earlier detailed factual background. I will discuss in the final section of this opinion how I would apply the factor of whether adequate procedures exist under Texas law in our case. Taken literally, the footnote means abstention does not apply to pretrial bail. I have conceded for purposes of analyzing *Younger* here that the force of the footnote has waned.

In summary, the three *Wallace* decisions from the Second Circuit are the seriatim equivalent of what the Supreme Court in *Littleton* dealt with in one decision. The *Wallace* district court entered orders that controlled how Legal Services would operate, including the number of cases individual

No. 18-11368

attorneys could be assigned; controlled the court's *pro se* docket; required detainees to be tried or released on their own recognizance if not timely brought to trial after a demand; and, most relevantly to us, required prompt evidentiary bail hearings, with the government needing to substantiate imposing bail as opposed to alternative release conditions and the court having to give written reasons for it decision. *Id.* at 401–03. This was a wholesale federal intrusion into the operation of state criminal prosecutions. The fact that some of the intrusion is pretrial, such as regarding bail, did not remove the considerations for abstention.

My key point, after all this discussion of the *Wallace* opinions, is that the intrusion into "the domain of the state," *id.* at 408, was indeed severe, not just as to bail but for the entire range of measures the district court imposed. What I see absent from the Supreme Court decisions and from the *Wallace* opinions is that if bail is involved, the *Middlesex* factor of undue interference with ongoing state proceeding is always satisfied. (Ironically, a fair interpretation of *Gerstein v. Pugh* footnote 9 is that this factor is never satisfied as to bail.) Instead, it is necessary to examine just what the plaintiffs are seeking as to bail. I accept the phrasing of some learned commentary that, under *Littleton*, it is proper to "rely on a fact-intensive evaluation of how state courts conduct their business and whether the federal exercise of jurisdiction would constitute an ongoing intrusion into the state's administration of justice." 17A MOORE'S FED. PRAC., § 122.72[1][c], at 122–107. We must focus on how a federal court is asked to exercise its jurisdiction as a fact-based issue. There is not a categorical answer just because bail is involved.

I give brief attention to the recent decisions from our court regarding injunctive relief governing bail in another large Texas county, the one containing the city of Houston. *See, e.g., ODonnell v. Harris Cnty.*, 892 F.3d 147 (5th Cir. 2018). The majority opinion here overrules *ODonnell*. The

No. 18-11368

extent of injunctive relief granted there was arguably too similar to what the Supreme Court rejected in *O'Shea v. Littleton*.

Finally, I review an opinion with which I mostly agree. *See Walker*, 901 F.3d at 1255. Ninth Circuit Judge O'Scannlain, sitting by designation in the Eleventh Circuit, analyzed whether a federal court could enjoin a Georgia city's "policy of using a secured-money bail schedule with bond amounts based on the fine an arrestee could expect to pay if found guilty, plus applicable fees." *Id.* at 1252. I start with a mild disagreement. The court wrote that *Younger* abstention is now "disfavored." *Id.* at 1254 (citing *Sprint*, 571 U.S. at 77–78). It is true that *Sprint* sought to halt the expansion of *Younger*'s reach. *See Sprint*, 571 U.S. at 81 (stating that misapplying the "three *Middlesex* conditions would extend *Younger* to virtually all parallel state and federal proceedings"). Instead of indicating disfavor, I find *Sprint* simply announced that the doctrine was now fully defined.[8]

I return to *Walker*. The court implied that footnote 9 in *Gerstein v. Pugh* should be taken on its own terms: abstention "does not readily apply here because Walker is not asking to enjoin any prosecution. Rather, he merely seeks prompt bail determinations for himself and his fellow class members." *Walker*, 901 F.3d at 1254 (citing *Gerstein v. Pugh*, 420 U.S. 103). The *Walker* court concluded that *Littleton* required abstention when broad

---

[8] The Wright & Miller treatise described *Sprint* as a "clarification":

> The Court clarified the meaning of the *Middlesex* and *Dayton Christian Schools* cases in 2013 in *Sprint Communications, Inc. v. Jacobs*. The Court made clear that the circumstances fitting within the *Younger* abstention doctrine are exceptional and include: (1) state criminal prosecutions; (2) civil enforcement proceedings; and (3) civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions.

17B WRIGHT & MILLER § 4254, at 79 & n.21 (Supp. 2022).

No. 18-11368

relief was sought that "amounted to 'an ongoing federal audit of state criminal proceedings.'" *Id.* at 1254–55 (quoting *Littleton*, 414 U.S. at 500).

Much less was being sought in *Walker*:

> Instead, as in *Gerstein*, Walker merely asks for a prompt pretrial determination of a distinct issue, which will not interfere with subsequent prosecution. At the very least, the district court could reasonably find that the relief Walker seeks is not sufficiently intrusive to implicate *Younger*. Because we review a *Younger* abstention decision for abuse of discretion, we are satisfied that the district court was not required to abstain.

*Id.* at 1255 (citation omitted).

Charting that analysis, I conclude the *Walker* court found the plaintiffs were not seeking nearly as broad of relief as in *Littleton*, that the resulting potential intrusion on state procedures was not severe, and that without considering adequacy of other remedies or the significance of the state's interest, that the district court did not abuse its discretion by deciding the merits of the claims. *Id.* at 1256–57. The *Walker* court never held that abstention was categorically inapplicable, but the considerations I have highlighted allowed the claims to be resolved in that case.

Though the court addressed only the interference factor, *Sprint* stated that the three *Middlesex* factors are not dispositive but are "appropriately considered by the federal court before invoking *Younger*." *Sprint*, 571 U.S. at 81. Further, the key justification for *Younger* abstention, *i.e.*, Our Federalism, is to allow state courts to function without federal court oversight absent exceptional circumstances. Once the *Walker* court concluded there was no interference, the federalism concerns were satisfied.

Equally significant is the *Walker* analysis after it refused to abstain. "Under the [City's] Standing Bail Order, arrestees are guaranteed a hearing within 48 hours of arrest to prove their indigency (with court-appointed

No. 18-11368

counsel) or they will be released." *Walker*, 901 F.3d at 1265. The district court insisted that the hearing must be within 24 hours even though "[b]oth procedures agree on the standard for indigency and that those found indigent are to be released on recognizance." *Id.* at 1265–66. The Eleventh Circuit held that the district court's imposing the 24-hour obligation was an abuse of discretion. *Id.* at 1266–67.

The district court also had ordered the City to use an affidavit-based system to determine indigency, while the Standing Bail Order provided for judicial hearings. *Id.* The Eleventh Circuit rejected that judicial alteration to the City's policies. "Whatever limits may exist on a jurisdiction's flexibility to craft procedures for setting bail, it is clear that a judicial hearing with court-appointed counsel is well within the range of constitutionally permissible options. The district court's unjustified contrary conclusion was legal error and hence an abuse of discretion." *Id.* at 1268–69.

The circuit court vacated the preliminary injunction imposed by the district court and allowed the City's Standing Bail Order to stand. *Id.* at 1272.

Judge O'Scannlain has shown us our way. Well, obviously, he has shown only me the way. Abstention requires fact-based analysis on what the plaintiffs seek and how burdensome it would be. We know that injunctive relief cannot "require for its enforcement the continuous supervision by the federal court over the conduct of the [officials involved in setting bail] in the course of future criminal trial proceedings." *Littleton,* 414 U.S. at 501. Neither can the relief be "a form of monitoring of the operation of state court functions that is antipathetic to established principles of comity." *Id.*

One difficulty in my conception is how to deal with the fact that plaintiffs' complaints often are excessive in their demands, anticipating being pared back as the case proceeds. Courts may grant relief that is far less than

plaintiffs sought. That reality can be handled by courts' dismissing suits that require abstention unless plaintiffs can revise to curb their claims.

In conclusion on whether resolving claims about bail procedures on the merits automatically leads to an impermissible interference with ongoing state proceedings, I find the answer to be "no." A complaint seeking the kind of relief that was rejected in *Littleton* and *Wallace* should cause the court to abstain. Claims seeking some procedural safeguards, that do not require monitoring by the federal court and otherwise avoid the excessiveness of claims in caselaw discussed here, might not require abstention. That depends on the claims, the existing bail procedures, and other facts. We err to make a categorical ruling that all such claims would impermissibly involve the federal court in state criminal procedures.

### III.     *Adequacy of opportunity to raise the federal claim in state court*

A consideration for *Younger* abstention is whether the state provides an *adequate* opportunity to bring the same constitutional claims in state court. *Middlesex*, 457 U.S. at 432. It is not enough to identify a procedure. The procedure must be measured for adequacy. I will examine some of the caselaw already discussed to see how it addressed adequacy of state remedies.

Early in describing *Younger* adequacy is *Gerstein v. Pugh*, 420 U.S. 103. Of course, the opinion concerned determinations of probable cause to detain someone, not bail, but the adequacy of state procedures is equally relevant to both issues. The five-justice majority opinion stated that "the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." *Id.* at 114. Requiring judicial action before an "*extended* restraint of liberty" occurs means delay has significance. In addition, the Court reviewed the roadblocks for a detainee in getting judicial review of probable cause: the prosecutor's filing an information meant there would be no preliminary hearing, and

No. 18-11368

*habeas corpus* was only available, if ever, in "exceptional circumstances." *Id.* at 106. "The only possible methods for obtaining a judicial determination of probable cause were a special statute allowing a preliminary hearing *after 30 days*, and arraignment, which the District Court found was often *delayed a month or more* after arrest." *Id.* (citing *Pugh v. Rainwater*, 332 F. Supp. at 1110) (footnote and statutory citations omitted; emphasis added). The Court closed its summary by stating "a person charged by information could be detained for a substantial period solely on the decision of a prosecutor." *Id.* The Court's emphasis on timeliness is undeniable.

The four concurring justices stated they joined the part of the majority opinion I just detailed "since the Constitution clearly requires at least a *timely* judicial determination of probable cause as a prerequisite to pretrial detention." *Id.* at 126 (Stewart, J., concurring) (emphasis added). The majority did not take issue with the concurring justice's using the word "timely." The Court had not stated Florida detainees could never obtain judicial determinations of probable cause, only that it "often" would not be made for at least a month. *Id.* at 106. Thus, a lack of a timely determination was at least part of the reason the majority rejected abstention.

There are other Supreme Court opinions indicating the importance of timely remedies. One explicit statement is in an opinion analyzing abstention in the context of a state administrative scheme for disciplining optometrists. *See Gibson v. Berryhill*, 411 U.S. 564 (1973). Proceedings were ongoing against plaintiff Berryhill and others at a state administrative board. Berryhill and other optometrists sued board members in federal court, claiming that board members were biased against them. *Id.* at 570. The Supreme Court stated that dismissing a federal suit based on *Younger* abstention "naturally presupposes the opportunity to raise and have *timely decided* by a *competent* state tribunal the federal issues involved." *Id.* at 577 (emphasis added). The presupposition failed because of the district court's finding that the board

No. 18-11368

members were biased. *Id.*[9] Admittedly, the timeliness portion of the presupposition did not come into play, only the competence factor. Nevertheless, Supreme Court *dicta* "is entitled to great weight." *Hignell-Stark v. City of New Orleans*, 46 F.4th 317, 330 n.21 (5th Cir. 2022).

*Berryhill* is cited in later significant precedents. In *Middlesex*, the Court analyzed abstention in the context of disciplinary proceedings before an attorney-ethics committee. Such proceedings were held to involve "vital state interests." *Middlesex*, 457 U.S. at 432 (citing *Moore v. Sims*, 442 U.S. at 426). The Court then wrote that the "pertinent inquiry is whether the state proceedings afford an adequate opportunity to raise the constitutional claims." *Id.* (quoting *Moore v. Sims*, 442 U.S. at 430, then citing *Berryhill*, 411 U.S. 564). The Court found "the state court desired to give Hinds a *swift* judicial resolution of his constitutional claims." *Id.* at 437 n.16 (emphasis added). The Court closed with this:

> Because respondent Hinds had an 'opportunity to raise and have *timely* decided by a competent state tribunal the federal issues involved,' *Gibson v. Berryhill*, 411 U.S., at 577, 93 S.Ct., at 1697, and because no bad faith, harassment, or other exceptional circumstances dictate to the contrary, federal courts should abstain from interfering with the ongoing proceedings.

*Id.* at 437 (emphasis added).

The *Moore v. Sims* opinion cited in *Middlesex* analyzed abstention in a case involving the Texas Family Code, which allowed the state to take custody of abused children. *Moore v. Sims*, 442 U.S. at 418–19. The parents

---

[9] In discussing whether state procedures were "adequate," the Court summarized that federal courts have found state agency remedies inadequate "on a variety of grounds. Most often this has been because of delay by the agency." *Id.* at 575 n.14 (emphasis added).

No. 18-11368

of children who had been taken into state custody brought suit in federal court; the district court enjoined the state from prosecuting any suit under the relevant statutory provisions pending a final decision on their constitutionality. *Id.* at 422. The Supreme Court disagreed, holding that "the only pertinent inquiry [for *Younger* abstention] is whether the state proceedings afford an *adequate opportunity* to raise the constitutional claims." *Id.* at 430 (emphasis added). An earlier, similar statement was supported by the signal of "*see*" for *Berryhill*. *Id.* at 425 (citing *Berryhill*, 411 U.S. 564).

A phrase with a possibly different emphasis in both *Moore v. Sims* and *Middlesex* is that "a federal court should abstain 'unless state law clearly bars the interposition of the constitutional claims.'" *Middlesex*, 457 U.S. at 432 (quoting *Moore v. Sims*, 442 U.S. at 426). Does that mean that absent a clear prohibition in the state proceedings to raising constitutional claims — regardless of questions about adequacy — abstention is required? That hardly makes sense, as the Court in both opinions included the analysis I have already detailed about adequacy and, in *Middlesex*, timeliness.

To understand the Court's use of "clearly bars," we need its context. In *Sims*, the facts about delay were detailed in the district court opinion. That factual recitation reveals the parents moved for a hearing in state court five days after a March 26 *ex parte* order that had removed their children. *Sims v. State Dept. of Public Welfare*, 438 F. Supp. 1179, 1184 (S.D. Tex. 1977), *rev'd*, *Moore v. Sims*, 442 U.S. 415. The judge was absent. *Id.* A hearing was held on April 5 on a newly filed writ of *habeas corpus*, but the court decided the matter needed to be transferred to another county. *Id.* A hearing was finally conducted there on May 5. *Id.* at 1185.

The federal district court stated that the 42-day delay for a hearing revealed that "in practice the state procedures operate in such a manner as to prevent or, at the very minimum, substantially delay the presentation of

No. 18-11368

constitutional issues," which meant "abstention would be inappropriate." *Id.* at 1189. Obviously, there were state procedures to hear the constitutional claims almost immediately after the children were taken from their parents, but it took over a month for a hearing finally to be held. The plaintiffs complained about not being "granted a hearing at the time that they thought they were entitled to one." *Moore v. Sims*, 442 U.S. at 430. The Supreme Court rejected that such episodic delays defeated abstention, as there was no indication of bad faith on behalf of anyone. *Id.* at 432. That is the context for the statement that abstention should apply "unless state law clearly bars the interposition of the constitutional claims." *Id.* at 425–26.

The use of that phrase in *Middlesex* had similar purposes. The attorney being disciplined argued there was no opportunity in the ethics proceedings to have constitutional issues considered. *Middlesex*, 457 U.S. at 435. The Supreme Court found no support for such a contention:

> [Attorney] Hinds failed to respond to the complaint filed by the local Ethics Committee and failed even to *attempt* to raise any federal constitutional challenge in the state proceedings. Under New Jersey's procedure, its Ethics Committees constantly are called upon to interpret the state disciplinary rules. Respondent Hinds points to nothing existing at the time the complaint was brought by the local Committee to indicate that the members of the Ethics Committee, the majority of whom are lawyers, would have refused to consider a claim that the rules which they were enforcing violated federal constitutional guarantees.

*Id.* (emphasis in original). The Court emphasized that a party must "'first set up and rely upon his defense in the state courts, even though this involves a challenge of the validity of some statute, unless it plainly appears that this course would not afford *adequate protection*.'" *Id.* (*quoting Younger*, 401 U.S. at 45 (quoting *Fenner v. Boykin*, 271 U.S. 240, 244 (1926)) (emphasis added).

No. 18-11368

There was no evidence in either *Middlesex* or *Moore v. Sims* that *adequate* consideration of constitutional challenges was generally unavailable in state court. Missteps along the way in receiving a hearing or failure even to use the available procedures did not show inadequacy. Each case cited *Berryhill*, which included timeliness as part of adequacy.

The necessity of taking advantage of available state procedures before claiming inadequacy is the point in other opinions. In one case, plaintiffs held in contempt by a state court sued in federal court to have the contempt statute declared unconstitutional; they had not made that claim in state court. *Juidice v. Vail*, 430 U.S. 327, 330 (1977). The Court held they "had an opportunity to present their federal claims in the state proceedings. No more is required" for abstention; the opportunity could not be flouted. *Id.* at 337. The Court discussed the state procedure, which seemingly could have provided effective relief. *Id.* at 337 n.14.

Another Supreme Court decision relying in large part on a party's shunning state procedures is *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1 (1987). An historically large jury verdict of $10.5 billion was entered against Texaco after a jury trial in state court. *Id.* at 4. In Texas, an appellant had to post a bond in the amount of the judgment, plus interest and costs. *Id.* at 5. Texaco could not afford the bond; instead of seeking relief in the state court itself, it filed suit in federal court and alleged the application of the requirement of so large a bond violated Texaco's constitutional rights. *Id.* at 6.

Texaco insisted "that *Younger* abstention was inappropriate because no Texas court could have heard Texaco's constitutional claims within the limited time available." *Id.* at 14. The Supreme Court responded: "But the burden on this point rests on the federal plaintiff to show 'that state procedural law barred presentation of [its] claims.'" *Id.* (quoting *Moore v. Sims*, 442 U.S. at 432). "Moreover, denigrations of the procedural

protections afforded by Texas law hardly come from Texaco with good grace, as it apparently made no effort under Texas law to secure the relief sought in this case." *Id.* at 15.    The Court also quoted the same *Younger* language I earlier quoted: "'The accused should first set up and rely upon his defense in the state courts, even though this involves a challenge of the validity of some statute, unless it plainly appears that this course would not afford adequate protection.'" *Id.* at 14–15 (quoting *Younger*, 401 U.S. at 45).

In sum, the Supreme Court did not say timeliness was irrelevant.    It wrote that before arguments about adequacy would be entertained, the party seeking to avoid abstention must be able to prove the inadequacy of the state procedures.    Texaco had failed even to try.    Yes, the Court also again referred to whether state procedures "barred" the claims.    Also, again, the context for the reference includes whether state remedies would "afford *adequate* protection."    *Id.* (emphasis added).

Some of the circuit court opinions I discussed earlier are useful here too.    In *Wallace III*, the Second Circuit highlighted the *Gerstein v. Pugh* concern about delay in Florida procedures:

> It is significant, therefore, that the Supreme Court's opinion in *Gerstein* emphasizes at the outset that the federal plaintiffs there had no right to institute state *habeas corpus* proceedings except perhaps in exceptional circumstances and that their only other state remedies were a preliminary hearing which could take place only after 30 days or an application at arraignment, which was often delayed a month or more after arrest.

*Wallace III*, 520 F.2d at 406.    The court then stated: "We do not consider this discussion feckless," *i.e.*, the discussion of limited procedures and inherent delays was meaningful; it affected the result.    *Id.*

No. 18-11368

In "sharp contrast" to Florida procedures, the *Wallace III* court explained that New York procedures "provide that a pre-trial detainee may petition for a writ of *habeas corpus* in the [trial-level] Supreme Court, that its denial may be appealed and that an original application for *habeas* may be made in the Appellate Division of the Supreme Court." *Id.* at 407 (statutory citations omitted). The Second Circuit faulted the district court for first making a fact finding "that state *habeas* relief was available to the plaintiff class with provision for appeal to the Appellate Division," but then not discussing "the availability of this remedy in that part of the opinion which rejected" the application of *Younger* abstention. *Id.* at 404–05. In addition, the *Wallace III* opinion stated that the record supported that one remedy — an evidentiary hearing on bail — had never been requested by any prisoner, and had it been, a hearing would have been conducted. *Id.* at 407.

Though the *Wallace III* court identified delay as important in *Gerstein v. Pugh*, the Second Circuit was silent on how quickly New York procedures could be employed.[10] The explanation in *Middlesex*, 457 U.S. at 435, may apply: inadequacy of state remedies must be *shown*. In *Wallace*, no one had even sought an evidentiary hearing on bail. In other words, available procedures were not tried and found wanting; they were not even tried.

A Second Circuit opinion relying on *Wallace III* held that timeliness mattered. *See Kaufman v. Kaye*, 466 F.3d 83 (2d Cir. 2006). Kaufman brought a federal suit to challenge the manner in which appeals were assigned among panels of judges in state court. *Id.* at 87. Abstention was necessary

---

[10] I obtained the unpublished district court opinion reversed by *Wallace III* to see if it had fact-findings about delay. Findings included existence of lengthy pretrial detention, long delay in indicting those arrested for felonies, and substantial delays for trial. *Wallace*, No. 72-C-898 (Feb. 14, 1975), at *7–9. As to *habeas*, though, all the district court stated was that a prisoner could apply to the state trial court, and review of its decision would then be available in that court's appellate division. *Id.* at *9. Nothing useful there.

No. 18-11368

because "the plaintiff has an 'opportunity to raise and have *timely* decided by a competent state tribunal' the constitutional claims at issue in the federal suit.'" *Id.* (quoting *Spargo v. New York State Comm'n on Judicial Conduct*, 351 F.3d 65, 77 (2d Cir. 2003) (emphasis added).

The quoted *Spargo* case was brought by state judges claiming that judicial ethics rules restricted their First Amendment rights. *Spargo*, 351 F.3d at 69–70. The Second Circuit stated that "to avoid abstention, plaintiffs must demonstrate that state law bars the *effective* consideration of their constitutional claims." *Id.* at 78 (emphasis added). That decision quoted the Supreme Court that plaintiffs, if they have an "opportunity to raise and have *timely* decided by a competent state tribunal" their constitutional claims, the federal courts should abstain. *Id.* at 77 (quoting *Middlesex*, 457 U.S. at 437) (emphasis added). The court summarized by stating that plaintiffs can proceed in federal court if they can "demonstrate that state law bars the effective consideration of their constitutional claims." *Id.* at 78. The *Kaufman* court later quoted this statement in *Spargo* about "effective consideration." *Kaufman*, 466 F.3d at 87. Effectiveness, not just existence, of state procedures for raising constitutional claims is needed. Depending on the issue, effectiveness can turn on timeliness.

This review of the caselaw revealed no precedents that refused to abstain because of untimely state procedures as to bail. Even so, the Supreme Court in *Berryhill* and *Middlesex* and the Second Circuit in *Kaufman* and *Spargo* all explicitly required timely state procedures. The Court also held that the Fourth Amendment required judicial intervention before there was an "*extended* restraint of liberty following arrest." *Gerstein v. Pugh*, 420 U.S. at 114. Adequacy generally of the available state procedures was discussed by the Supreme Court in *Gerstein v. Pugh*, *Moore v. Sims*, and *Middlesex*, and by the Second Circuit in *Wallace III*, *Kaufman*, and *Spargo*. The adequacy,

No. 18-11368

including timeliness, of state procedures did not require measurement in *Middlesex*, *Juidice*, *Texaco*, or in *Wallace III* because they had not been tried.

A distinction is appropriate here. Delays in a criminal prosecution do not allow a defendant to seek federal court relief unless there is bad faith in the proceedings. *Moore v. Sims*, 442 U.S. at 432. "[T]he cost, anxiety, and inconvenience of having to defend against a single criminal prosecution" cannot amount to irreparable injury. *Younger*, 401 U.S. at 46. The prosecution likely violates no rights, so its tribulations must be endured. Quite differently, unconstitutional pretrial detention leads to injury that is different in kind as well as degree to the cost, anxiety, and inconvenience of being prosecuted. An unconstitutional pretrial detention is an immediate violation of a right. It should not have to be endured any longer than necessary. It is difficult for me to see, when dealing with a potentially unconstitutional "restraint of liberty following arrest," *Gerstein v. Pugh,* 420 U.S. at 114, how adequacy of a remedy can be divorced from its timeliness.

The majority discusses the statutory procedures available in Dallas County and in Texas. *See Majority op.* at 18–19. Of importance, though, the Supreme Court in 1975 stated that procedures available in Dade County and in Florida were too delayed to support abstention. *Gerstein v. Pugh*, 420 U.S. at 106, 123–25. The district court on remand in this case was not given much evidence, but it identified one example (from four decades ago) of quite slow *habeas* procedures. *See Ex parte Keller*, 595 S.W.2d 531 (Tex. Crim. App. 1980). Any future case regarding bail procedures should create a factual record that allows a determination of adequacy — including timeliness.

*IV. Conclusion*

This appeal is moot. Any future litigation about bail in Dallas County would need to address the new law labeled S.B.6. *See* Act of August 31, 2021, 87th Tex. Leg. 2d C.S., S.B. 6). Those procedures are the ones that now

No. 18-11368

must provide adequate, timely mechanisms for adjudicating constitutional claims.

For purposes of this opinion, I accept that *Younger* analysis should be applied to claims about bail. I do not see that impermissible interference with state courts will always result if a federal court enters orders regarding state court bail procedures and policies. We know that what some district courts have done, such as the relief granted in *Littleton* or in *Wallace*, is unacceptable. Those actions were impermissibly intrusive, and abstention was invoked. Lesser claims and remedies as in *Walker* might be permissible. There are guardrails for intrusions as to bail but not a locked gate.

As to the adequacy of state court remedies, a significant point of departure for me from the majority is that I believe the timeliness for any review of the constitutional claim is relevant. When dealing with whether someone is unconstitutionally being detained before trial, abstention due to too-slow-to-matter review in state court is an abdication of the federal court's "virtually unflagging obligation" to decide a case for which it has jurisdiction. *See Colorado River Water Conservation Dist.*, 424 U.S. at 817.

In closing, I acknowledge plaintiffs' goal in bail litigation may be to require release of almost all arrestees without money bail. Regardless, our *en banc* statement was correct that "[r]esolution of the problems concerning pretrial bail requires a delicate balancing of the vital interests of the state with those of the individual." *Pugh v. Rainwater*, 572 F.2d at 1056.

Indigents have constitutional rights after an arrest. *See id.* at 1056–59. States must strive to protect those rights. In populous jurisdictions such as Dallas County, individualized determinations of the need for bail for each arrestee may seem all but impossible. The record as to past practices supports that each arrestee was rapidly processed by a magistrate judge as to bail so the judge could then advance to the next arrestee. Even so, not

No. 18-11368

releasing those who are dangerous or likely to disappear, or at least not releasing without some form of restraint such as bail, are vital state interests.

Whether the constitutional rights of arrestees are protected while the state seeks to uphold its interests in Dallas County must now to be analyzed under the new legislation. Any litigation would need to be in state court if the conditions for abstention are met. We cannot answer now whether those conditions will be satisfied. Therefore, though I concur in judgment, I do not join the portion of the majority's opinion analyzing abstention.

No. 18-11368

Stephen A. Higginson, *Circuit Judge*, joined by Stewart, Dennis and Haynes, *Circuit Judges*, concurring in part, dissenting in part:

Fifth Circuit precedent states, "*[I]n some limited instances*, 'a federal court has leeway to choose among threshold grounds for denying audience to a case on the merits.'" *Env't Conservation Org. v. City of Dallas*, 529 F.3d 519, 525 (5th Cir. 2008) (emphasis added) (quoting *Sinochem Int'l v. Malaysia Int'l Shipping*, 549 U.S. 428, 431 (2007)). This is not "one of those instances." *Id.*

With our sister circuits, we have recognized that the leeway granted by *Sinochem* is not boundless, but "carefully circumscribed" to cases "'where subject-matter or personal-jurisdiction is difficult to determine,' and dismissal on another threshold ground is clear." *Snoqualmie Indian Tribe v. Washington*, 8 F.4th 853, 863 (9th Cir. 2021) (quoting *Sinochem*, 549 U.S. at 436), *cert. denied sub nom. Samish Indian Nation v. Washington,* 142 S. Ct. 1371 (2022), *and cert. denied*, 142 S. Ct. 2651 (2022); *accord Env't Conservation Org.*, 529 F.3d at 524-25 (Where a "res judicata analysis is no less burdensome than" an inquiry into mootness—the "doctrine of standing in a time frame"—we may not decide the case on grounds of res judicata.). One danger of the discretion *Sinochem* affords is that courts will "*use* the pretermission of the jurisdictional question *as a device* for reaching a question of law that otherwise would have gone unaddressed." *In re Facebook, Inc., Initial Pub. Offering Derivative Litig.*, 797 F.3d 148, 158-59 (2d Cir. 2015) (emphases added) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 98 (1998)).

I would decline the narrow discretion *Sinochem* permits. It is notable that the majority's discussion of *Younger* spans more than *four times* the length of its discussion of mootness. There is no plausible suggestion the court is motivated by judicial economy. Instead, I fear, our court today uses *Sinochem* as a device to expansively critique Supreme Court, prior Fifth

No. 18-11368

Circuit, and sister circuit case law. *See ante*, at 17 (limiting *Gerstein v. Pugh*, 420 U.S. 103 (1975)); *id.* at 19-21 (criticizing then overruling *ODonnell v. Harris Cnty.*, 892 F.3d 147 (5th Cir. 2018)); *id.* at 21-22 (criticizing *Walker v. City of Calhoun*, 901 F.3d 1245 (11th Cir. 2018)).[1]

I would hold that this case is moot and affirm on that basis alone.

---

[1] It is impossible to overlook that the important liberty versus public-safety controversy over pretrial detention and cash bail practices, first confronted in *ODonnell* and then here, did lead to Texas legislative reform. Federal court intervention appears to me to have been less an interference than a catalyst for state reform.

No. 18-11368

James E. Graves, Jr., *Circuit Judge*, dissenting:

"Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). "The burden of demonstrating mootness 'is a heavy one.'" *Los Angeles Cty. v. Davis*, 440 U.S. 625, 631 (1979) (quoting *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953)). Mootness can occur when "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Id.* In *New York State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525 (2020), the Court held that New York City's amended gun rule mooted the case because it was "the precise relief that petitioners requested in the prayer for relief in their complaint." *Id.* at 1526.

Plaintiffs here, however, are challenging the practices of bail determination in Dallas County. They are not challenging S.B. 6 or any other statute. On limited remand, the district court admitted into the record Plaintiffs' evidence, which showed that the alleged illegal practices continue post-S.B. 6. The case the district court relied on in finding the case moot, *Pugh v. Rainwater*, 572 F.2d 1053 (5th Cir. 1978), is distinguishable. While *Pugh* also dealt with pretrial bail issues, the court held that "[t]he record before the Court contains only evidence of practices under criminal procedures which predate the adoption of the current Florida rule." *Id.* at 1058. The court concluded that it "determined that on its face [the newly enacted statute] does not suffer such infirmity that its constitutional application is precluded." *Id.* It further expressed that any constitutional challenge to the newly enacted statute should wait until "presentation of a proper record reflecting application by the courts of the State of Florida." *Id.* 1058–59

No. 18-11368

Here, Plaintiffs provided evidence that the complained about practices persist despite S.B. 6's enactment. Plaintiffs describe post-S.B. 6 video evidence where the alleged unconstitutional practices continue. This case is not automatically mooted simply because S.B. 6 addresses bail practices. Plaintiffs allege that there remain continuing constitutional violations and that S.B. 6 does not provide the relief Plaintiffs requested in the prayer for relief in their complaint. Six months of post-S.B. 6 video evidence does not prevent the court from "meaningfully . . . assess[ing] the issues in this appeal on the present record." *Fusari v. Steinberg*, 419 U.S. 379, 387 (1975).

I would find that the case is not moot. Therefore, I respectfully dissent.